**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION**

| | |
|---|---|
| DAKOTA RURAL ACTION, DALLAS GOLDTOOTH, INDIGENOUS ENVIRONMENTAL NETWORK, NDN COLLECTIVE, SIERRA CLUB, and NICHOLAS TILSEN, <br><br> Plaintiffs, <br><br> vs. <br><br> KRISTI NOEM, in her official capacity as Governor of the State of South Dakota, JASON RAVNSBORG, in his official capacity as Attorney General, and KEVIN THOM, in his official capacity as sheriff of Pennington County, <br><br> Defendants. | Case No.: 5:19-cv-5026 <br><br> **PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION** |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiffs move this Court to preliminarily enjoin enforcement of South Dakota Codified Laws §§ 22-10-6 and 22-10-6.1 (together, "Criminal Statutes") and South Dakota S.B. 189, 2019 Leg. Session (S.D. 2019), to be codified in South Dakota Codified Laws § 20-9-1, *et. seq.* ("Riot Boosting Act" or "Act") (collectively, "Challenged Laws" or "Laws").

## INTRODUCTION

The Challenged Laws unconstitutionally burden Plaintiffs and countless others who seek to exercise their First Amendment right to protest. The Laws target protected speech and are not narrowly tailored to achieve any compelling government interest in preventing violence, force, or riots. They are also fatally overbroad. The Laws thus violate the First Amendment both facially

and as applied to Plaintiffs. Additionally, the Laws are impermissibly vague. By forcing

Plaintiffs to choose between forgoing their constitutional rights or facing the threat of sanctions,

the Challenged Laws impose ongoing, irreparable harm on Plaintiffs. Therefore, for the reasons

stated below, this Court should grant Plaintiffs' Motion for a Preliminary Injunction.

## STATEMENT OF FACTS

### I.      The Challenged Laws

South Dakota law defines a "riot" as "[a]ny use of force or violence or any threat to use

force or violence, if accompanied by immediate power of execution, by three or more persons,

acting together and without authority of law." S.D.C.L. § 22-10-1. Unlike the Challenged Laws,

the state's definition of riot includes an imminence element requiring "immediate power of

execution." *Id.* As described more fully below, this is an essential element of a constitutionally

sound incitement statute.

With the 2019 addition of the Riot Boosting Act, South Dakota now has three laws that

prohibit "boosting" or "encouraging" violence at a riot. *See* S.D.C.L. §§ 22-10-6, 22-10-6.1; Act

§ 2. S.D.C.L. § 22-10-6.1 provides in full, "Any person who does not personally participate in

any riot but who directs, advises, encourages, or solicits other persons participating in the riot to

acts of force or violence is guilty of a Class 5 felony." S.D.C.L. § 22-10-6 provides in full, "Any

person who participates in any riot and who directs, advises, encourages, or solicits other persons

participating in the riot to acts of force or violence is guilty of a Class 2 felony."

The most recent of the laws, the Riot Boosting Act, passed the State Legislature on

March 11, 2019 and was signed by Governor Kristi Noem on March 27, 2019, taking effect

immediately.

The Riot Boosting Act provides, in relevant part:

"In addition to any other liability or criminal penalty under law, a person is liable for riot boosting, jointly and severally with any other person, to the state or a political subdivision in an action for damages if the person:

(1) Participates in any riot and directs, advises, encourages, or solicits any other person participating in the riot to acts of force or violence; [or]

(2) Does not personally participate in a riot but directs, advises, encourages, or solicits other persons participating in the riot to acts of force or violence."

Act § 2.

In addition, the Act provides that "[a] defendant who solicits or compensates any other person to commit an unlawful act or *to be arrested* is subject to three times a sum that would compensate for the detriment caused." *Id.* § 4 (emphasis added).

Under the Act, "person" is defined broadly as "any individual, joint venture, association, partnership, cooperative, limited liability company, corporation, nonprofit, other entity, or any group acting as a unit." *Id*. § 1.

The Act also creates a "riot boosting fund," to be filled with damages paid by those who violate the Act. *Id*. § 5. Money from the fund may be used to pay either for damages from a riot or it "may be transferred to the pipeline engagement activity coordination expenses fund." *Id*. The Act also allows "any third party having an interest in preventing a riot or riot boosting" to enter an agreement with the State "to establish joint representation of a cause of action under section 2 of this Act." *Id*. § 3. This includes TransCanada Keystone Pipeline, LP ("TransCanada"), described further below, which has a financial incentive to agree with the State to prosecute as many claims as possible under the law to deter opponents of the pipeline.

## II.      The Keystone XL Pipeline

TransCanada, a Canadian company, plans to build and operate an oil pipeline, known as the "Keystone XL pipeline," to transport heavy crude oil across the border between Saskatchewan, Canada and Montana, and then south through South Dakota and Nebraska. In South Dakota, TransCanada plans for the pipeline to cross through the following counties: Harding, Perkins, Butte, Pennington, Meade, Haakon, Jones, Lyman, and Tripp.

The United States initially denied TransCanada's application to build the pipeline on November 6, 2015. *See Indigenous Envtl. Network v. United States Dep't of State*, No. CV-17-29-GF-BMM, 2017 WL 5632435, at *2 (D. Mont. Nov. 22, 2017). On January 24, 2017, President Trump issued a Presidential Memorandum Regarding Construction of the Keystone XL Pipeline inviting TransCanada to reapply. *Id*. The State Department received a renewed application from TransCanada on January 26, 2017, and approved it on April 4, 2017. *Id*.

In November 2017, the Indigenous Environmental Network ("IEN"), a plaintiff in this case, sued the State Department and others in federal district court in Montana alleging that the issuance of the permit violated the Administrative Procedure Act, National Environmental Policy Act, and Endangered Species Act. In November 2018, the court granted partial judgment to both parties and enjoined TransCanada "from engaging in any activity in furtherance of the construction or operation of Keystone and associated facilities." *Indigenous Envtl. Network v. United States Dep't of State*, 347 F. Supp. 3d 561, 591 (D. Mont. 2018); *see also Indigenous Envtl. Network v. United States Dept. of State*, No. CV-17-29-GF-BMM, 2019 WL 652416 (D. Mont. Feb. 15, 2019). On March 15, 2019, the Ninth Circuit Court of Appeals denied TransCanada's motion for a stay of the injunction pending appeal. Construction is currently enjoined.

### III.     Government Support for the Act

According to the State's website, the Riot Boosting Act is a "legislative solution[] that allows for an orderly construction process for this pipeline and others," and it is "the result of" Governor Noem's discussions "with TransCanada, public safety, law enforcement officials, lawmakers, and other stakeholders." South Dakota State News, http://news.sd.gov/newsitem.aspx?id=24203 (last visited April 8, 2019). The Governor did not meet with Native American tribes or environmental groups as part of this process.

At a press conference in support of the Act, Governor Noem stated that a goal of the Act is to "shut down" "entities that want to come in and create disruption on a build." *See* March 4, 2019 "Press Conference" of Governor Noem found at https://www.youtube.com/watch?v=IDHe5cjxgRU at minute 6:24-6:50. Governor Noem cited George Soros, a supporter of progressive causes, as one "entity" the State hopes to "shut down" with the Act. *Id.* She stated that the Act is aimed at "those who are in the state actively using *disruptive activity or* violent activity to do harm o*r disruption* to the project," including those who "slow this operation down." *Id.* at 11:15-11:34 (emphasis added).[1]

### IV.     Plaintiffs' Protests

Plaintiffs fear prosecution under the criminal statutes, and imposition of civil liability under the Act. Plaintiffs oppose the Keystone XL pipeline for several reasons. These include but are not limited to the government's and companies' failure to consult with tribes regarding the pipeline and the threat it, and the fossil fuel industry generally, poses to the environment.

---

[1] If Defendants deny these statements, Plaintiffs reserve the right to request that the Court take judicial notice of this information. *See* Fed. R. Evid. 201.

Plaintiffs have provided, and plan to continue providing, funding, training, and other advice and encouragement to individuals who plan to protest the Keystone XL pipeline. Plaintiffs are not inciting and do not plan to incite any individuals to commit imminent violent or forceful actions. To the contrary, Plaintiffs advocate against the use of violence. Plaintiffs plan to advise and encourage others to protest the pipeline through peaceful methods.

## A. Dakota Rural Action

Dakota Rural Action ("DRA") is a nonprofit organization that supports protest by landowners in South Dakota related to land use. Exhibit 1, Declaration of Dakota Rural Action ("DRA Decl.") ¶¶ 1-3. DRA strongly objects to tar sands development,[2] TransCanada's use of eminent domain, and the way TransCanada threatened landowners with loss of their land through eminent domain during the initial proposal for the pipeline. *Id.* ¶¶ 4-5. At that time, DRA helped South Dakota landowners organize the group Protect South Dakota Resources to share the burden of legal expenses and to negotiate collectively with TransCanada. *See* https://www.dakotarural.org/issues/keystone-xl-pipeline/.

Since then, DRA has organized landowners along the Keystone XL route to ensure that land, water, and resources are protected if the pipeline is constructed in South Dakota. *Id.*; DRA Decl. ¶ 7. Additionally, DRA has funded, advised, and encouraged individuals to peacefully resist the pipeline. DRA Decl. ¶ 4. DRA also educates and organizes the public, including ranchers and environmentalists, regarding the State's permitting process and urges individuals to

---

[2] Tar sands are a mixture of sand, clay, water, and bitumen, a thick black oil that can be refined into synthetic crude oil. Mining tar sands poses a grave risk to the nearby environment as the mining process produces substantial waste and can pose a risk to nearby water supplies. American GeoSciences Institute, "What are tar sands?" found at https://www.americangeosciences.org/critical-issues/faq/what-are-tar-sands; *see also* DRA Decl. ¶ 6.

ask the South Dakota Public Utilities Commission to deny Keystone XL's permit. *Id.* ¶ 8. And DRA has been working and continues to work with its landowner members to ensure that the issues and concerns raised by the Keystone XL pipeline proposal are recognized and addressed throughout the state and federal permitting processes, and through local ordinances and state legislation. *Id.* ¶ 9.

### B. The IEN Plaintiffs

Indigenous Environmental Network ("IEN") is a nonprofit organization that works with indigenous individuals and grassroots community groups to protect their sacred sites, land, water, air, natural resources, and the health of their people and all living things, and to build economically sustainable communities. Exhibit 2, Declaration of Indigenous Environmental Network ("IEN Decl.") ¶¶ 1-2. Dallas Goldtooth is an organizer for IEN. Exhibit 3, Declaration of Dallas Goldtooth ("Goldtooth Decl.") ¶ 1.

IEN and Mr. Goldtooth (collectively, "IEN Plaintiffs") support frontline communities fighting environmental injustice through educational forums, information sharing, and trainings on peaceful civil disobedience. IEN Decl. ¶ 8; Goldtooth Decl. ¶ 5. They will continue to provide trainings and community awareness workshops along the route of the pipeline. *Id.* The IEN Plaintiffs have funded travel for individuals who have participated in peaceful protests and they will fund travel for individuals who plan to participate in peaceful protests against the pipeline. IEN Decl. ¶ 9.

IEN is also part of the Promise to Protect alliance, a group that is leading training sessions around the country to "educate, empower, and elevate the voices and skills of community members to take back their land and push out extractive oil and gas companies." *See* Promise to Protect training sign-up description at https://actionnetwork.org/events/miami-

sunday; IEN Decl. ¶ 10; Goldtooth Decl. ¶ 6. Through the Promise to Protect trainings, the IEN Plaintiffs will help to encourage, advise, and train individuals who will set up prayer camps, legal protests on public highways, and use their bodies to peacefully resist the construction of the pipeline. IEN Decl. ¶ 11; Goldtooth Decl. ¶ 7.

Mr. Goldtooth, in addition to his work with IEN, also plans to advocate against the construction of the Keystone XL pipeline in his personal capacity. Goldtooth Decl. ¶ 8. He currently uses, and plans to continue to use, his personal social media accounts to educate others about the dangers of the Keystone XL pipeline and to encourage others to oppose the pipeline. *Id*. ¶ 9. He also plans to continue to use his social media channels as a medium for citizen journalism, a practice which includes asking viewers to support those opposing the pipeline's construction. *Id*. ¶ 10.

### C.  The NDN Plaintiffs

NDN Collective is a nonprofit organization that seeks to increase philanthropic and capital investment in Native communities; to use trainings, leadership development, and education to prepare Indigenous communities to create sustainable outcomes for their people and planet; and to develop a political agenda for activism related to the Indigenous community goals of, among other things, protecting and defending their land, air, water and the planet. Exhibit 4, Declaration of NDN Collective ("NDN Decl.") ¶¶ 1, 3. Nicholas Tilsen is the President of NDN Collective. Exhibit 5, Declaration of Nicholas Tilsen ("Tilsen Decl.") ¶ 1.

NDN Collective is one of the original signers of the Promise to Protect alliance. NDN Decl. ¶ 6. NDN Collective has participated in organizing meetings relating to the resistance against the Keystone XL pipeline and has hosted meetings with protesters and organizers. *Id*. ¶ 7. NDN Collective and Mr. Tilsen (collectively, "NDN Plaintiffs") plan to continue encouraging

and collaborating with protesters. NDN Decl. ¶ 8; Tilsen Decl. ¶ 8. The NDN Plaintiffs will help to encourage, advise, and train individuals who will set up prayer camps, legal protests on public highways, and use their bodies to peacefully resist the construction of the pipeline. NDN Decl. ¶ 9; Tilsen Decl. ¶ 9.

The NDN Plaintiffs are raising money to support Native-led resistance to the pipeline and they will employ community organizers to work with communities along the path of the pipeline who are directly impacted by it. NDN Decl. ¶ 10; Tilsen Decl. ¶ 10. NDN Collective's work in protesting the pipeline is one part of its comprehensive approach to rebuilding Native economies and communities and ensuring that they have the resources to defend their communities from harmful and exploitative resource extraction. NDN Decl. ¶ 11.

### D. Sierra Club

Sierra Club is the nation's oldest grassroots organization dedicated to the protection and preservation of the environment. Exhibit 6, Declaration of Sierra Club ("Sierra Club Decl.") ¶ 1. Sierra Club does not condone, engage in, or advocate for any acts of violence or property destruction and never has. *Id*. ¶ 7. Sierra Club has participated in Board-approved non-violent civil disobedience on several occasions, including a 2013 protest against Keystone XL in front of the White House and a non-violent protest against the Line 3 pipeline in Minnesota in 2018. *Id*. ¶ 8. In the future, Sierra Club expects to consider participation in other such non-violent civil disobedience actions from time to time as part of its overall advocacy efforts. *Id*. ¶ 9.

Furthermore, Sierra Club and its members engage in and promote numerous forms of lawful speech in opposition to the Keystone XL pipeline. *Id*. ¶ 10. This speech includes, but is not limited to: submitting comments to government agencies, speaking at public hearings, and encouraging members of the public to do the same; educating the public about the risks and

impacts of Keystone XL through social media, online materials, newspaper op-eds, and other mediums; organizing or participating in peaceful and lawful public protests or rallies; and providing funding and other support to non-profit organizations that share Sierra Club's commitment to opposing Keystone XL through all lawful means available. *Id*. ¶ 11.

## V.     The Challenged Laws' Harm to Plaintiffs

Due to their current and planned activity, Plaintiffs now fear criminal and civil sanctions under the Challenged Laws. DRA Decl. ¶¶ 10-11; IEN Decl. ¶¶ 12-13; Goldtooth Decl. ¶¶11-12; NDN Decl. ¶ 13; Tilsen Decl. ¶¶ 11-12; Sierra Club Decl. ¶¶ 12-13. The trainings, funding, and other support Plaintiffs have planned for the anti-pipeline protests could, if carried out, violate the Challenged Laws. Plaintiffs fear liability under the Act and criminal statutes notwithstanding their lack of intent to cause a riot or to incite violent or forceful activity. *Id*. Plaintiffs must choose between encouraging and advising pipeline protesters, on the one hand, and exposing themselves to prosecution and civil liability under the Challenged Laws, on the other.

## ARGUMENT

## I.     Standard Governing the Issuance of a Preliminary Injunction

When considering whether to grant a preliminary injunction, a court must consider four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). In order to obtain preliminary relief, the movant is not required to show a greater than 50% chance of success on the merits of the claim; instead, the question is whether the balance of equities so favors the movant that justice requires the court to intervene until the merits are determined. *Id*. at 113; *S. Div. First Premier Bank v. U.S. Consumer Fin. Protection Bureau*, 819 F. Supp. 2d 906, 912 (D.S.D. 2011) ("A plaintiff is

required to make only a prima facie showing that there has been an invasion of its rights . . . ." (citation omitted)).

"Where a preliminary injunction is sought to enjoin the implementation of a duly enacted statute, [] district courts [must] make a threshold finding that a party is likely to prevail on the merits." *Planned Parenthood Minn., N.D., S.D. v. Daugaard*, 799 F. Supp. 2d 1048, 1053 (D.S.D. 2011) (alterations in original) (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008) (en banc)). At the same time, "[w]hen a Plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Phelps-Roper v. Troutman*, 662 F.3d 485, 488 (8th Cir. 2011), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 545 F.3d 678 (8th Cir. 2012).

Plaintiffs are entitled to a preliminary injunction. Plaintiffs have a strong likelihood of success because the Challenged Laws impose content-based restrictions on their protected speech in a manner that is overbroad, vague, and fails to vindicate any valid state interest. Because they subject Plaintiffs to the untenable choice between self-censorship and risking criminal and civil liability, the Laws impose irreparable harm, threaten the public interest, and tip the balance of equities heavily in favor of granting a preliminary injunction. Thus, all four factors favor the grant of a preliminary injunction.

## II.    Plaintiffs are Likely to Succeed on the Merits.

Plaintiffs have a strong likelihood of success on the merits because the Challenged Laws are unconstitutional as content-based regulations of protected, non-incitement speech that are not narrowly tailored to a compelling government interest. In addition, even assuming that a narrow

band of speech covered by the Challenged Laws is unprotected, these laws are fatally overbroad and impermissibly vague.

**A. The Challenged Laws Are Content-Based Prohibitions of Speech that Cannot Survive Strict Scrutiny.**

**1. The Challenged Laws Target Protected Speech on the Basis of its Content.**

The First Amendment protects impassioned speech, particularly on issues of public debate. Indeed, full-throated speech—including words that may encourage, but do not incite, violence—is highly valuable to our democracy, and is especially important in the realm of political advocacy. The United States has a "profound national commitment to the principle that debate on public issues"—including construction of the Keystone XL pipeline—"should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964). This "is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964).

The First Amendment's guarantee of free speech is so important that it even covers speech some might consider undesirable or inflammatory. "The mere tendency of speech to *encourage* unlawful acts is not a sufficient reason for banning it." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002) (emphasis added). In fact, the Supreme Court "has made clear . . . that mere *advocacy* of the use of force or violence does not remove speech from the protection of the First Amendment." *NAACP v. Claiborne Hardware Co*., 458 U.S. 886, 927 (1982).

Rather than recognize the value of free speech in a democracy, the Challenged Laws attempt to proscribe it—and they do so in a content-based manner. *See* S.D.C.L. §§ 22-10-6, 22-10-6.1; Act § 2. As content-based regulations of protected speech, the Laws are presumptively

invalid. *See, e.g.*, *RAV v. City of St. Paul*, 505 U.S. 377, 382 (1992) (noting that regulations which attempt to proscribe speech because of disapproval of the ideas expressed are content-based restrictions and are presumptively invalid). Defendants "bear the burden to rebut that presumption" by showing that the laws satisfy strict scrutiny. *United States v. Stevens*, 559 U.S. 460, 468 (2010). Defendants must demonstrate that the statutes are narrowly tailored to achieving a compelling government interest and that they represent the least restrictive means of advancing that interest. *See Sable Comm's of Cal. Inc. v. FCC*, 492 U.S. 115, 126 (1989). As detailed below, Defendants cannot satisfy this standard.

**2. The Challenged Laws Are Not Narrowly Tailored to Achieve a Compelling Government Interest.**

The government's interest in maintaining peace is compelling, and it can justify statutes banning incitement—a narrow, clearly-bound category of unprotected speech. But the Challenged Laws reach far beyond that unprotected category, and so cannot properly be characterized as incitement laws. The statutes lack three elements essential to a constitutional ban on incitement: intent to cause violence, likelihood of causing violence, and imminence of the intended violence. For that reason, the Challenged Laws are far from narrowly tailored to this (or any) purported government interest.

The Supreme Court set forth the test for a constitutional, and therefore narrowly tailored, incitement law in *Brandenburg v. Ohio*, 395 U.S. 444 (1969). "The constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447. Under that controlling law, a statute must include three distinct elements to pass constitutional muster as a prohibition on incitement: the law can proscribe only speech that (1) is

uttered with the specific intent to incite lawless action; and (2) is likely to incite such action; but only if (3) the intended lawless action is imminent. *See also Hess v. Indiana*, 414 U.S. 105, 109 (1973) (specific intent and likelihood of violence); *U.S. v. McDermott*, 29 F.3d 404, 406 (8th Cir. 1994) (specific intent); *see also Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) (imminence).

The *Brandenburg* Court struck down a state law that "punishe[d] persons who 'advocate or teach the duty, necessity, or propriety' of violence" as a political tool, those "who publish . . . any book or paper containing such advocacy," those "who 'justify' the commission of violent acts" with intent to spread a political message, and those "who 'voluntarily assemble' with a group formed 'to teach or advocate the doctrines of criminal syndicalism.'" 395 U.S. at 448. Because the law failed to include the elements of intent, likely causation, and imminence, the Court held that "the statute's bald definition of the crime in terms of mere advocacy [was] not distinguished from incitement to imminent lawless action" and therefore violated the Constitution regardless of the government's interest. *Id.* at 448–49.

The *Brandenburg* Court also rejected the state's attempt to punish a leader of the KKK for telling twelve organizers, "We're not a revengent [*sic*] organization, but if our [government] continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance [*sic*] given." *Id.* at 446. The Court explained that punishing him for this speech would "punish mere advocacy" and so would exceed the bounds of the First Amendment. *Id.* at 449.

As the speech at issue in *Brandenburg* demonstrates, speech that is protected under this test may be vehement, aggressive, and distasteful. Nonetheless, adhering to the line carefully drawn by the Supreme Court is essential to free speech and political discourse. "An advocate

must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause." *Claiborne Hardware Co.*, 458 U.S. at 928. Accordingly, the Supreme Court has "not permitted the government to assume that every expression of a provocative idea will incite a riot." *Texas v. Johnson*, 491 U.S. 397, 408-09 (1989). Rather, "[t]he Supreme Court has distinguished between speech which merely advocates law violation and speech which incites imminent lawless activity." *United States v. Buttorff*, 572 F.2d 619, 624 (8th Cir. 1978). As the Eighth Circuit has recognized, "The former is protected; the latter is not." *Id.*

More than a decade after *Brandenburg*, the Supreme Court used an even more protective test to hold that the impassioned speech of civil rights leaders could not be *civilly* sanctioned as incitement. *Claiborne Hardware Co.*, 458 U.S. at 928. In *Claiborne*, the Court noted that, for a state to impose civil, rather than criminal, liability, not only must the three *Brandenburg* elements be satisfied, but unlawful activity must also actually occur as a result of the speech. *Id.* (reciting *Brandenburg* test and then noting that civil liability could only be considered if the speaker's language "had been followed by acts of violence[]").

Using that test, the Supreme Court held that Charles Evers—as relevant to the case, one of the leaders of a boycott of all white-owned businesses in Claiborne County, Mississippi that sought to achieve societal, political, and economic change—could not be held liable for warning "that the Sheriff could not sleep with boycott violators at night" or for telling participants, "If we catch any of you going in any of them racist stores, we're gonna break your damn neck." *Id.* at 902. While recognizing that these statements "might have been understood as inviting an unlawful form of discipline or, at least, as intending to create a fear of violence," the Court held that "[t]he emotionally charged rhetoric . . . did not transcend the bounds of protected speech set

forth in *Brandenburg*" in part because it "d[id] not incite lawless action." *Id.* at 928. "To rule otherwise," the Court explained, "would ignore the 'profound national commitment'" to uninhibited, robust public debate. *Id.* (quoting *Sullivan*, 376 U.S. at 270).

The tests that protected the speech of a KKK leader in *Brandenburg* and a civil rights activist in *Claiborne* from liability under unconstitutional laws equally protect Plaintiffs' speech today. Because the Criminal Statutes are not limited to speech intended and likely to cause imminent violence, and because the Riot Boosting Act additionally fails to require that actual harm occur as a result of the prohibited speech, the Challenged Laws toss aside the Supreme Court's carefully balanced equilibrium. Instead, the Laws "sweep[] within [their] condemnation speech which our Constitution has immunized from governmental control," regardless of the governmental interest. *Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969).

The District of South Dakota has recognized the importance of this delicate balance. *See United States ex rel. Means v. Solem*, 440 F. Supp. 544, 550 (D.S.D. 1977) (recognizing that a "restriction . . . on 'mere advocacy' and conduct . . .would be an unconstitutional infringement of the First Amendment"). *Solem* addressed the question of whether Russell Means, while on bail pending appeal, could engage in expressive conduct, speech, and association. The state argued that Mr. Means had violated his bail by participating in American Indian Movement activities. Chief Judge Nichol rejected that argument, noting that "[t]his nation's laws and our dedication to the Bill of Rights will simply not permit" such a result. *Id*. at 550. Judge Nichol cautioned that "an invasion of First Amendment rights can not be predicated on a speculative concern of danger. Such a speculation can too easily be made." *Id*. at 551 (citation omitted).

Thus, while the state is permitted to outlaw violent acts, activities that involve advocacy and expression are protected by the First Amendment. That distinction applies here with

particular force because the Challenged Laws target expressive activity. Plaintiffs seek to advocate positions of great public importance and utilize the power of peaceful protest to oppose policies and actions with which they disagree. In the event Plaintiffs—or anyone else—engage in violent acts or intentional incitement of imminent violence, they can lawfully be arrested and prosecuted. But the State is not permitted to do what it seeks to do here, which is to punish protected expressive speech. In short, the fatal flaw in the Challenged Laws is that, in the State's zeal to protect itself from acts it can lawfully prosecute, it banned entire categories of expression that are the hallmark of a free society, and which occupy the highest rung on the First Amendment ladder. *See Carey v. Brown*, 447 U.S. 455, 467 (1980). For this reason alone, the Challenged Laws fail strict scrutiny.

### 3. The Challenged Laws Are Not Narrowly Tailored to a Compelling Government Interest Because Other South Dakota Laws Already Accomplish Any Valid Government Purpose That Could Be Advanced by the Challenged Laws.

In addition, the Challenged Laws are not narrowly tailored to achieving the government's interest in preventing violence, or in preventing disruption to construction through anything other than protected speech, because other South Dakota laws already make such activity illegal.

The government's purported interest in preventing riots is already served by the South Dakota statute making riot a Class 4 felony. *See* S.D.C.L. § 22-10-1. Similarly, the government's purported interest in preventing problems caused by "out-of-state rioters funded by out-of-state interests" is already addressed by the crime of "solicitation." *Id*. § 22-4A-1. South Dakota also already criminalizes unlawful assembly. *Id*. §22-10-9. And South Dakota's stated interest in preventing unprotected disruption is already addressed by the misdemeanors of "disorderly conduct," *id*. § 22-18-35, "standing on highway with intent to impede or stop traffic," *id*. § 22-

18-40, and "refusal to disperse or refrain from riot or unlawful assembly," *id*. § 22-10-11. In contrast to the Challenged Laws, each of these laws explicitly contains an intent requirement.[3]

Because any purported state interest in the Challenged Laws is already addressed by existing South Dakota law, there is no compelling state interest to which the Laws are tailored. To the contrary, the Challenged Laws only infringe upon protected speech. *See State v. Kane*, 266 N.W.2d 552, 555–56 (S.D. 1978) (holding that S.D.C.L. § 22-10-4 does not raise First Amendment concerns because it does not contemplate liability for mere advocacy, and affirming the same for S.D.C.L. §§ 22-10-1 and 22-10-5, but expressly declining to do so for S.D.C.L. § 22-10-6) *overruled in part on other grounds by State v. Smith*, 353 N.W.2d 338 (S.D. 1984) (addressing statements in furtherance of a conspiracy).

Public officials' statements during the legislature's consideration of the Riot Boosting Act support the conclusion that the Act was *intended* to suppress political speech and expression that might interfere with the construction of the pipeline. According to the State's website, the Act is the "result" of Governor Noem's meetings "with TransCanada, public safety, law enforcement officials, lawmakers, and other stakeholders" about "develop[ing] legislative solutions that allow for an orderly construction process for this pipeline and others." http://news.sd.gov/newsitem.aspx?id=24203. According to Governor Noem, the Act's goal is to "shut down" entities that "want to come in and create disruption on a build" of the pipeline. *See* March 4, 2019 "Press Conference" of Governor Noem, found at https://www.youtube.com/watch?v=IDHe5cjxgRU at minute 6:24-6:50; *see also id.* at 11:15-11:34. Governor Noem's lobbyist similarly testified that those who participated in the protest at

---

[3] Plaintiffs take no position as to whether these other laws pass First Amendment scrutiny. They are cited here only to show that the State has means other than bans on protected speech to address their purported concerns.

Standing Rock in North Dakota were "professional protesters" from other parts of the country who had to be stopped. *See* "Hearing on SB 189 and 190," found at https://sdlegislature.gov/Legislative_Session/Bills/Bill.aspx?Bill=SB189&Session=2019 at minute 16:50.

Thus, the Challenged Laws additionally fail strict scrutiny because, far from being tailored to a compelling government interest, they squelch protected speech—something the state should have *no* interest in doing.[4] South Dakota is not permitted under the First Amendment to ban protesters, nor criminalize speech that might "create a disruption" in the minds of those who favor the pipeline. Simply put, the state of South Dakota cannot make it illegal to oppose a pipeline or to encourage others to oppose a pipeline.

### B.     The Challenged Laws Are Fatally Overbroad.

Even assuming that a narrow band of speech covered by the Challenged Laws is unprotected, it is disproportionately small in comparison to the universe of advocacy speech the Laws cover. As noted above, in light of the Laws' insufficient tailoring under *Brandenburg* and existing South Dakota law, the Challenged Laws appear to regulate largely, if not entirely, that which the government cannot regulate: protected speech. Thus, their overbreadth is "*substantial*, not only in an absolute sense, but also relative to the statute[s'] plainly legitimate sweep." *United States v. Williams*, 553 U.S. 285, 292 (2008).

"The first step in [an] overbreadth analysis is to construe the challenged statute[.]" *Id.* at 293. The second is to assess "whether the statute, as [a court has] construed it, criminalizes a

---

[4] To the extent the government is able to articulate an actual and compelling interest not accomplished through existing South Dakota law, the Challenged Laws nevertheless fail strict scrutiny because, as described above, they lack the elements necessary to be narrowly tailored to any government interest: intent to cause violence, likelihood that the speech will cause violence, and imminence of the intended violence.

substantial amount of protected expressive activity." *Id.* at 297. "[T]he critical dispute . . . is whether, and to what extent, the words [of the statute] criminalize protected speech." *United States of America v. Sineneng-Smith*, 910 F.3d 461, 473 (9th Cir. 2018). The words "directs, advises, encourages, [and] solicits," used in S.D.C.L. §§ 22-10-6, 22-10-6.1, and § 2 of the Act, cover a broad range of speech. The same is true for the words "solicits or compensates" in § 4 of the Act. This is particularly troubling given the absence of any temporal, causal, or intent-based limitations in the Laws.

1. **The Challenged Laws' Prohibition on Encouraging, Advising, Soliciting, and Directing Is Overbroad.**

Both by their common definitions and in accordance with how courts have interpreted them, the terms "directs, advises, encourages, or solicits" encompass a wide range of protected speech. "Encourage" is commonly defined as "to inspire with courage, animate, inspirit," *Oxford English Dictionary Online* (3d ed. 2018), and courts across the country have applied it consistent with its dictionary definition. *See United States v. Thum*, 749 F.3d 1143, 1147 (9th Cir. 2014); *United States v. He*, 245 F.3d 954, 960 (7th Cir. 2001); *State v. Melchert-Dinkel*, 844 N.W. 2d 13, 23 (Minn. 2014). Similarly, the ordinary definition of "advise" is "to inform (someone) about a fact or situation[]." *Oxford English Dictionary Online* (3d ed. 2018); *see also Melchert-Dinkel*, 844 N.W. 2d at 23 (same). These definitions encompass a large amount of protected speech.

Courts around the country have struck down statutes that prohibit "encouraging" or "advising" unlawful activity as overbroad. In striking down a federal law that criminalized "encourag[ing] or induc[ing] an alien to come to, enter, or reside in the United States," the Ninth Circuit held that no "reasonable reading of the statute can exclude speech." *Sineneng-Smith*, 910 F.3d at 467. "To conclude otherwise, [a court] would have to say that 'encourage' does not mean encourage and that a person cannot 'induce' another with words." *Id.*; *see also Melchert-Dinkel*,

844 N.W. 2d at 23-24 (holding that a statute that criminalized "advis[ing]" or "encourag[ing]" another to commit suicide was overly broad). As the Ninth Circuit explained, "[a]t the very least, it is clear that the statute potentially criminalizes the simple words—spoken to a son, a wife, a parent, a friend, a neighbor, a coworker, a student, a client—'I encourage you to stay here.'" *Sineneng-Smith*, 910 F.3d at 467. Equally, the Challenged Laws' prohibition potentially sanctions the simple words, spoken to a friend, a fellow organizer, or a nearby protester, "I encourage you to fight the Keystone XL pipeline with all you've got."

Laws prohibiting "encouraging" or "soliciting" are also fatally overbroad.[5] In *National Gay Task Force v. Board of Educ. of City of Oklahoma City*, the Tenth Circuit, in a decision affirmed by the Supreme Court, struck down as overbroad an Oklahoma statute that prohibited teachers from "advocating, soliciting, imposing, encouraging or promoting public or private homosexual activity," which was illegal in Oklahoma at that time. 729 F.2d 1270, 1274 (10th Cir. 1984), *aff'd sub nom. Bd. of Educ. of City of Oklahoma City, Okl. v. Nat'l Gay Task Force*, 470 U.S. 903 (1985). The court held that "'[e]ncouraging' and 'promoting,' like 'advocating,' do not necessarily imply incitement to imminent action" and so the law was overbroad. *Id.* at 1274. In addition, the court noted that the law could attach to "[a]ny public statement that would come to the attention of school children, their parents, or school employees." *Id.* at 1275. Here, the

---

[5] While criminal solicitation is a separate offense under South Dakota law, S.D.C.L. § 22-4A-1, the word "solicit" is clearly intended to have a different meaning in the Challenged Laws. S.D.C.L. § 22-4A-1 includes "solicit" in a list of terms which also includes "commands, hires, [and] requests[.]" In contrast, the Challenged Laws include the word in a list with "directs, advises, and encourages[.]" Therefore, the doctrine of *noscitur a sociis*—that a term is to be interpreted according to the words with which it is associated—shows that in this situation "solicits" should be defined similarly to "encourages" or "advises." See *United States v. Williams*, 553 U.S. 285, 294 (2008) (noting that a statute's "string of operative verbs[,]" including the verb "solicits," should be defined in context of the other words in the list). As such, the existence of S.D.C.L. § 22-4A-1 does not alleviate concerns about the overbroad nature of the word "solicits" in the Challenged Laws.

Challenged Laws prohibit any statements "soliciting" and "encouraging" conduct that could come to the attention of a protester or rioter and so are equally overbroad.

In *United States v. Dellinger*, the Seventh Circuit upheld a federal prohibition on "urging" riots—but only after cautioning that, had "urge" been defined to include merely soliciting, the law would have impermissibly criminalized "little more than an effort at persuasion, unrelated to its potential for or success in producing the desired action." 472 F.2d 340, 361 (7th Cir. 1972). The court upheld the prohibition on "urging" only because that word typically refers to more forceful behavior than solicitation, and because the law provided that "mere oral or written advocacy of ideas or expressions of belief" could not trigger liability. *Id.* at 361–62.

The Challenged Laws' prohibition on encouraging, advising, soliciting, and directing cannot be similarly saved. Rather, the Laws impermissibly capture "effort[s] at persuasion, unrelated to [their] potential for or success in producing the final result." *Dellinger*, 472 F.2d at 361. The Challenged Laws could result in speakers being punished for nothing more than publicly expressing support for anti-pipeline protests. This includes Plaintiff's past, present, and future advocacy—such as the NDN Plaintiffs' current fundraising for Native-led resistance to the pipeline and future plans to train individuals who will set up prayer camps; DRA's efforts to encourage and educate ranchers and environmentalists to urge the State to deny Keystone XL's permit; the IEN Plaintiffs' practice of maintaining an informational clearinghouse, organizing campaigns, directing actions and public awareness, and building the capacity of community and tribes to address environmental justice issues; and Sierra Club's campaign to educate the public about the risks and impacts of Keystone XL through social media, online materials, newspaper op-eds, and other mediums.

The Laws also reach a substantial swath of protected speech uttered by those not before the Court. Because "[t]he danger of the [Challenged Laws] 'is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution,'" *St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481, 487 (8th Cir. 2006) (quoting *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 393 (1988)), a court should "not hesitate[] to take into account possible applications of the statute[s] in other factual contexts besides that at bar." *NAACP v. Button*, 371 U.S. 415, 432 (1963).

For example, if a protest of the Keystone XL pipeline turned violent, the Laws would reach an individual who invited a friend to the protest, one who posted "#NoKeystoneXL" on social media causing others to attend, or one who chipped in for gas money to help friends attend the protest. The same would hold true even if these individuals engaged in such speech and advocacy weeks before the riot occurred.[6]

Similarly, if a protester were unsure about whether or not to join in the violent activity and, while debating, checked his phone to find that a public figure whom he greatly admired had just tweeted, "We must do everything we can to stop the Keystone XL pipeline," the public figure would be liable under the Challenged Laws should the protester, spurred on by the message, decide to engage in violent or forceful activity. This liability would attach regardless of whether the public figure intended to advocate the use of violence, and regardless of whether the public figure even knew about the imminent violence. In fact, even if the public figure then sent

---

[6] While the State may attempt to argue that S.D.C.L. § 22-10-6 or § (2)(1) of the Act satisfies the imminence requirement because those statutes require that the speaker must both participate in the riot and encourage others to violence, the laws do not make clear that the speech must be uttered during the riot. Instead, it is enough that the speaker participated in the riot, and, at some point, made a statement that (to a jury) encouraged a rioter to acts of force or violence.

out an additional tweet that made clear he or she did not intend to advocate violence, the public figure could still be liable for the behavior of the protester.

And, though the Riot Boosting Act was passed with the pipeline protests in mind, these Laws chill speech reflecting various ideologies, on different issues, and with diverse goals. For example, those who invite friends to, encourage others via social media to go to, contribute financially to, or help advise the organizers of a "Trump 2020" rally—or simply tweet "I encourage Trump supporters to do everything within their power to re-elect our President"—could equally be sanctioned if related events turned violent.[7]

### 2. The Riot Boosting Act's Prohibition on Soliciting or Compensating Others to Be Arrested Is Overbroad.

Section 4 of the Riot Boosting Act—which makes a "defendant who solicits or compensates any other person . . . to be arrested" liable for treble damages—is also fatally overbroad. As noted above, the Act's used of "solicitation," both here and in § 2, encompasses a wide range of speech.

Even assuming that "solicitation" in § 4 refers to a narrower category of speech than the same word in § 2, it is nevertheless overbroad. While the government may prohibit solicitation of an unlawful act, the Supreme Court has rejected "the contention that 'solicitation' is wholly outside the area of freedoms protected by the First Amendment." *Button*, 371 U.S. at 429. Rather, "a State cannot foreclose the exercise of constitutional rights by mere labels." *Id.* On that basis, the Supreme Court held that the First and Fourteenth Amendments protected the NAACP's

---

[7] Should the State argue that the Laws would not be applied to cover this type of speech, that admission underscores the Laws' vagueness and overbreadth, and the reality that the Riot Boosting Act is merely an attempt to target one type of political speech that the state deems undesirable.

solicitation of clients for mission-driven litigation, and that a state could not prohibit such solicitation. *Id.* at 428–29.

This conclusion also holds for the Act's ban on soliciting another "to be arrested." Getting arrested is not an unlawful act, and individuals who are arrested have not necessarily committed unlawful acts. *See Davis v. United States*, 229 F.2d 181, 185 (8th Cir. 1956) ("[A]n arrest is in the nature of a mere accusation, and is not evidence that the person arrested has committed the offense charged."). Yet, under § 4, a defendant could be exposed to treble damages for compensating or soliciting a person to commit a lawful act that ends in a false arrest. This is in sharp contrast to South Dakota's criminal solicitation law, which penalizes only intentional solicitation, and only of a felony level offense that is likely to occur. S.D.C.L. § 22-4A-1.

Section 4's ban on "compensating" another "to be arrested" is equally problematic. In *Claiborne Hardware Co.*, the Supreme Court specifically rejected the notion that an organization assisting its members with legal costs, such as posting bond and providing legal representation for those arrested during the boycott, could expose the organization to civil liability. 458 U.S. at 931 n.78. The Act violates this precedent. For example, an organization's members could be reasonably concerned that if they attended a protest, there would be a chance that, even if they were protesting peacefully, they could be arrested as the police attempted to disperse the assembly. In order to assuage this fear, the organization could assure its members that if they were arrested at a protest but not convicted of a crime, then they would be reimbursed for the cost of their bail. Under the Act, regardless of the ultimate guilt or innocence of the arrestee, the organization would be liable for treble damages. This result is a far cry from the "precision of regulation" required by *Claiborne Hardware Co.*, 458 U.S. at 931. Additionally, § 4 of the Act

provides a substantial incentive for the State, through its police force, to arrest as many protesters as possible, regardless of whether their activities are unlawful, in order to expose any so-called "riot boosters" to treble damages, adding to the Act's chilling effect.

Thus, the amount of protected speech the Challenged Laws impact is substantial when compared to their legitimate sweep. Although "[t]he concept of 'substantial overbreadth' is not readily reduced to an exact definition," *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984), the Supreme Court has made clear that criminal statutes "must be scrutinized with particular care" and "those that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *City of Houston v. Hill*, 482 U.S. 451, 459 (1987). Our First Amendment "freedoms are delicate and vulnerable, as well as supremely precious." *Button*, 371 U.S. at 433. Because they "need breathing space to survive, government may regulate in the area only with narrow specificity." *Id.* The Challenged Laws fail to meet this standard and are facially invalid.

**B. The Riot Boosting Act Violates the First Amendment Right of Association.**

As noted above, the Riot Boosting Act applies not only to individuals but also organizations. Because the law broadly defines "person" to include, *inter alia*, organizations such as any "nonprofit, other entity or any group acting as a unit[,]" any organization that provides services that could be interpreted as encouraging or advising protesters to commit an unlawful act would be liable under § 2 of the Act. This result is in direct contrast to the Supreme Court's holding in *Claiborne Hardware Co.*, which overturned a lower court's determination that the NAACP was civilly liable based on Charles Evers' speech, quoted above. 458 U.S. at 929–30. In addition to holding that Mr. Evers' speech was protected, the Supreme Court also made clear that the state could not have imposed liability on the NAACP for his speech even if it had

been unlawful unless it was "undertaken within the scope of [the organization's] actual or apparent authority," or the organization "had knowledge and specifically ratified" the unlawful acts. *Id*. at 930-32. In reaching this conclusion, the Court recognized that "[t]he rights of political association are fragile enough without adding the additional threat of destruction by lawsuit." *Id*. at 931. The Act ignores this principle, and allows liability to attach to an organization that does not have knowledge of, and did not specifically ratify, violent acts.

Additionally, as noted above, § 4 of the Riot Boosting Act directly contradicts *Claiborne Hardware Co.* and chills associational rights by exposing an organization to damages if it provides bail for any members who have been arrested. In *Claiborne Hardware Co.*, the Supreme Court held that the NAACP posting bond and providing legal representation for those arrested during the boycott was not evidence that it had ratified illegal behavior. *Id*. at 931 n.78. No safeguards for associational rights are present in the Riot Boosting Act, and it is unconstitutional for this additional reason.

### C. The Challenged Laws are Void for Vagueness

Finally, the Challenged Laws are impermissibly vague in violation of the Fourteenth Amendment. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Due process requires clarity for two reasons. First, a vague law "fails to give ordinary people fair notice of the conduct it punishes," *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015); *Duhe v. City of Little Rock*, 902 F.3d 858, 864 (8th Cir. 2018), and second, it invites "arbitrary and discriminatory application" by failing to provide "explicit standards for those [government actors] who apply [it]." *Grayned*, 408 U.S. at 108.

Courts have been especially willing to invalidate statutes for vagueness when they criminalize behavior based on the reaction it causes in others, when they do not contain a scienter requirement, and when they risk chilling speech. The Challenged Laws embody each of these infirmities.

The Challenged Laws' prohibition on encouraging, advising, directing, and soliciting others is vague in part because it is defined by the reactions of listeners. Courts have invalidated statutes on this ground because reactions can vary by listener and, therefore, they are impossible to know in advance. In *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971), the Supreme Court invalidated a statute that prohibited "annoy[ing]" passersby as impermissibly vague because "[c]onduct that annoys some people does not annoy others." *Id*. More recently, the Eighth Circuit found a city ordinance that prohibited conduct and speech that resulted in "such a gathering of persons or stopping of vehicles as to impede either pedestrians or vehicular traffic" to be unconstitutionally vague because it "criminalize[d] activity based primarily on often unpredictable reactions of third parties rather than directly on a person's own actions." *Stahl v. City of St. Louis*, 687 F.3d 1038, 1042 (8th Cir. 2012). While the court did not find the ordinance to be "vague in the traditional sense that its language is ambiguous," it held that "the ordinance does not provide people with fair notice of when their actions are likely to become unlawful." *Id.* ("The ordinance criminalizes speech if it has the consequence of obstructing traffic, but the speaker does not know if his or her speech is criminal until after such an obstruction occurs.").

The same is true of the Challenged Laws: a violation occurs if an individual or organization's words have the effect of encouraging another person. Similar to the problem the Supreme Court identified in *Coates,* what encourages one person may not encourage another, 402 U.S. at 614; and, as in *Stahl*, "in many situations such an effect is difficult or impossible to

predict," 687 F.3d at 1041. Therefore, the Challenged Laws do not provide appropriate notice of what will trigger liability.

The Challenged Laws are also vague because they lack a *mens rea* requirement. *See City of Chicago v. Morales*, 527 U.S. 41, 55 (1999) (holding a vague law with no *mens rea* requirement that infringes on a constitutional right "is subject to facial attack"). In *Stahl*, the Eighth Circuit held that the "due process and fair notice infirmity [wa]s further demonstrated by the ordinance's lack of a *mens rea* requirement." 687 F.3d at 1041. The Eighth Circuit recently re-emphasized the importance of a scienter requirement when upholding Arkansas' disorderly conduct statute, which prohibits *intentionally* causing "inconvenience, annoyance and alarm," "primarily because it contains a *mens rea* requirement[.]" *Duhe v. City of Little Rock*, 902 F.3d 858, 864 (8th Cir. 2018). Each of the Challenged Laws lacks this element.

Finally, clarity is especially important in the Challenged Laws because they interfere with First Amendment rights. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *Button*, 371 U.S. at 432–33. This increased scrutiny is necessary because if a law "abuts upon sensitive areas of basic First Amendment freedoms[,]" then it "inevitably leads citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Stahl*, 687 F.3d at 1041 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972)). Additionally, "[s]peech is an activity particularly susceptible to being chilled, and regulations that do not provide citizens with fair notice of what constitutes a violation disproportionately hurt those who espouse unpopular or controversial beliefs." *Id.*; *see also Coates*, 402 U.S. at 615 (highlighting the importance of statutory clarity in the First Amendment context).

Moreover, the exacting requirement of clarity where free speech is involved is "based in part on the need to eliminate the impermissible risk of discriminatory enforcement, for history shows that speech is suppressed when either the speaker or the message is critical of those who enforce the law." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1051 (1991) (citations omitted). That danger is particularly stark where, as here, a law (the Riot Boosting Act) has admittedly been passed in direct response to specific protests and in coordination with the entities against whom the protests are directed.

The Challenged Laws suffer from each of these deficiencies—they punish speech based on the reaction it causes in others, they do not include a *mens rea* element, and they are susceptible to limiting free speech on controversial public issues, including construction of the pipeline. The Challenged Laws will chill speech on this and other important issues. Therefore, the Laws are void for vagueness and unconstitutional.

### III. Plaintiffs Will Suffer Immediate and Irreparable Harm Without an Injunction

Absent an injunction, Plaintiffs continue to face immediate and irreparable harm: they must choose between restricting their speech on an issue that greatly affects them and facing criminal and civil liability under the Challenged Laws. They are presented with this choice every day as they prepare for trainings and other support of protests, including, for example, NDN Plaintiffs' upcoming training on April 6.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). In addition, when, as here, "a party brings a pre-enforcement challenge to a statute that provides for criminal penalties and claims that the statute chills the exercising of its right to free expression, the chilling effect alone may constitute injury." *St. Paul Area Chamber of Commerce v.*

*Gaertner*, 439 F.3d 481, 487 (8th Cir. 2006). Therefore, this factor strongly favors a grant of preliminary injunction.

### IV. The Balance of Harms Favors Plaintiffs' Constitutionally Protected Rights.

As noted above, the chilling of Plaintiffs' free speech is an irreparable and substantial injury. *See Phelps-Roper v. Nixon*, 509 F.3d 480 (8th Cir. 2007). Meanwhile, Defendants would face no comparable harm as a result of an injunction. As an initial matter, the State has claimed that the purpose of the Riot Boosting Act is to deal with unruly protests meant to disrupt construction of the pipeline. However, construction of the pipeline is currently enjoined. *Indigenous Envtl. Network v. United States Dep't of State*, 347 F. Supp. 3d 561 (D. Mont. Nov. 8, 2018); *see also Indigenous Envtl. Network v. United States Dep't of State*, No. CV-17-29-GF-BMM, 2019 WL 652416 (D. Mont. Feb. 15, 2019). Because the construction is enjoined, the State will suffer no harm if the Riot Boosting Act is preliminarily enjoined. The State's interest in enforcing S.D.C.L. §§ 22-10-6 and 22-10-6.1 while litigation proceeds is similarly weak. While the State may assert an interest in prohibiting lawlessness, as noted above, other South Dakota laws advance that interest, while these Laws target protected speech, highlighting the harm to Plaintiffs and tipping the balance further in their favor.

### V. The Public Interest Favors Granting an Injunction

Finally, the public interest favors an injunction. "[T]he public interest, as reflected in the principles of the First Amendment, is served by free expression on issues of public concern." *Kirkeby v. Furness*, 52 F.3d 772, 775 (8th Cir. 1995); *see also New York Times v. Sullivan*, 376 U.S. 254, 270 (1964) (emphasizing the importance of "uninhibited, robust, and wide-open" debate on public issues); *Texas v. Johnson*, 491 U.S. 397, 408-09 (1989) (noting that the First Amendment best "serve[s] its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger[]"); *Wolf v. City of*

*Aberdeen, S.D.*, No. CIV. 90-1014, 1990 WL 272709, at *2 (D.S.D. July 2, 1990) ("In addition, judicial intervention in this dispute will necessarily further the public interest in the free dissemination of information relative to local government administration.")

By allowing South Dakota to hold speakers, and any organizations that associate with them, criminally and civilly liable for any speech that encourages a rioter to commit an act of violence, the state is depriving the public of the benefits of full-throated discourse on important public issues. Therefore, the public interest also favors granting Plaintiffs' motion for preliminary injunction. Moreover, the public interest is served by striking unconstitutional laws from the books.

## CONCLUSION

The First Amendment right to free speech, especially regarding issues of public concern, is fundamental to a functioning democracy. Unfortunately, South Dakota has not abided by well-settled First Amendment jurisprudence. Instead, the State has enacted legislation that contains broad and undefined terms and punishes speakers regardless of their intent or the likelihood that their speech will cause imminent violence. Because the State chose to ignore the Supreme Court's guidance, and because Plaintiffs and the public will continue to suffer irreparable harm otherwise, the Court should grant Plaintiffs' motion for preliminary injunction.

Dated this 9th day of April, 2019

/s/ Brendan V. Johnson
Brendan V. Johnson (SD Bar # 3263)
Erica A. Ramsey (SD Bar # 4901)
Timothy W. Billion (SD Bar # 4641)

ROBINS KAPLAN LLP
140 North Phillips Ave, Suite 307
Sioux Falls, SD 57104
Tel: 605-335-1300
BJohnson@RobinsKaplan.com
ERamsey@RobinsKaplan.com
TBillion@RobinsKaplan.com


Courtney Bowie*
American Civil Liberties Union of South
Dakota
P.O. Box 1170
Sioux Falls, SD 57101
Tel: 201-284-9500
cbowie@aclu.org
*To be admitted pro hac vice*

Vera Eidelman*
American Civil Liberties Union Foundation
Speech, Privacy, and Technology Project
125 Broad St.
New York, NY 10004
Tel: 212-549-2500
veidelman@aclu.org
*To be admitted pro hac vice*

Stephen Pevar (SD Bar # 1364)
American Civil Liberties Union Foundation
765 Asylum Avenue
Hartford, CT 06105
Tel: 860-570-9830
Fax: 860-570-9840
spevar@aclu.org
*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I, Brendan V. Johnson, hereby certify that the foregoing memorandum complies with the limits in D.S.D. Civ. LR 7.1(B)(1). I further certify that, in preparation of this memorandum, I used Microsoft Word 2016 and this word processing program has been applied specifically to include all text – including headings, footnotes, and quotations – except the caption, signature block, and this certification. I further certify that this document contains 10,279 words.

/s/ Brendan V. Johnson_____

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2019, the foregoing was served upon the following counsel for the parties via e-mail.

Richard M. Williams
Chief Deputy Attorney General
Office of the Attorney General
1302 E. Hwy. 14, Suite 1
Pierre, SD 57501-8501
Phone: (605) 773-3215
Fax: (605) 773-4106
Rich.williams@state.sd.us

*Attorney for Defendants Governor Noem and*
*Attorney General Ravnsborg*

J. Crisman Palmer
Gunderson Palmer Nelson Ashmore LLP
506 Sixth Street
PO Box 8045
Rapid City, SD 57709
Phone: (605) 342-1078
Fax:  (605) 342-9503
cpalmer@gpna.com

*Attorney for Defendant Sheriff Thom*

/s/ Brendan V. Johnson_____