# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH DAKOTA
## WESTERN DIVISION

| | |
|---|---|
| DAKOTA RURAL ACTION, DALLAS GOLDTOOTH, INDIGENOUS ENVIRONMENTAL NETWORK, NDN COLLECTIVE, SIERRA CLUB, AND NICHOLAS TILSEN, <br><br> Plaintiffs, <br><br> vs. <br><br> KRISTI NOEM, in her official capacity as Governor of the State of South Dakota, JASON RAVNSBORG, in his official capacity as Attorney General, and KEVIN THOM, in his official capacity as Sheriff of Pennington County, <br><br> Defendants. | No. 5:19-cv-05026-LLP <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT THOM'S MOTION TO DISMISS** |

## INTRODUCTION

Plaintiffs are two individuals and four organizations that seek to engage in full-throated advocacy in protest of the Keystone XL Pipeline. They brought this facial and as-applied challenge to enjoin Defendant Pennington County Sheriff Kevin Thom, among others, from enforcing South Dakota Codified Laws §§ 22-10-6 and 22-10-6.1 (together, "Criminal Laws") and South Dakota S.B. 189, 2019 Leg. Session (S.D. 2019), to be codified in South Dakota Codified Laws § 20-9-1, *et seq.* ("Riot Boosting Act" or "Act") (collectively, "Challenged Laws" or "Laws"). Plaintiffs oppose the Challenged Laws on the grounds that they are content-based restrictions on expression that are not narrowly tailored to achieving any compelling government interest, they are overly broad, and they are impermissibly vague in violation of the First Amendment and the Due Process Clause of the Constitution.

Thom moves to dismiss this action not because he asserts that the Challenged Laws pass constitutional muster, but rather on the grounds of jurisdiction, citing Federal Rules of Civil Procedure 12(b)(1) (subject matter jurisdiction) and 12(h)(3) (dismissal for lack of subject matter jurisdiction). *See* Sheriff Thom's Motion to Dismiss ("Motion"), Dkt. 23; Memorandum in Support of Motion ("Mem."), Dkt. 24. Thom claims that the Court lacks jurisdiction because Plaintiffs have failed to allege an injury in fact or that the injury is fairly traceable to him. In addition, Thom seeks to dismiss the Complaint for failure to state a claim because he contends that his authority to enforce the Challenged Laws derives not from a county policy, but only from a state policy, and as such Plaintiffs have not adequately pled municipal liability under the requirements set forth in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978) ("*Monell* claim").

Thom's arguments are fatally flawed. As discussed more fully below, Plaintiffs have standing because they have alleged an injury in fact—reasonable fear of arrest, prosecution and civil liability under the Challenged Laws for engaging in protected speech, and chilling of that speech—and they have alleged that their as-applied injury is fairly traceable to Thom because he is charged with enforcing the law. In addition, Plaintiffs have adequately pled a *Monell* claim because Thom's policies give him discretion in whether and how to enforce the Challenged Laws, and the vagueness of the Challenged Laws requires Thom to exercise discretion and make choices in enforcing the Laws. The words of the Laws, such as "advise," "encourage," and "solicit," are subject to interpretation. Each time Thom makes a choice about the Laws' meaning, as the highest official in the county for that action, he is doing so as a policymaker for Pennington County and exposes the County to liability each time. Because enforcement of the

Laws necessarily requires the exercise of discretion by Thom when being enforced, he is an appropriate defendant to this lawsuit and municipal liability has been adequately pled. As such, Thom's Motion to Dismiss should be denied.

## LEGAL STANDARDS

A motion to dismiss for lack of subject matter jurisdiction may be granted only "if the plaintiff fails to allege an element necessary for subject matter jurisdiction." *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993) (citing *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 731–32 (11th Cir.1982)). Pursuant to Federal Rule of Civil Procedure 8(a)(1), a complaint need only "contain a short and plain statement of the grounds upon which the court's jurisdiction depends." *Id.* "In a facial challenge to jurisdiction, all of the factual allegations concerning jurisdiction are presumed to be true[.]" *Id.* (citing *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir.1990)).[1] "The general rule is that a complaint should not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Osborn*, 918 F.2d at 729 n.6 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

In reviewing a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a

---

[1] A complaint can be "challenged on its face or on the factual truthfulness of its averments." *Titus*, 4 F.3d at 593. Whether the challenge is facial or factual may determine the applicable standard for reviewing the complaint. Thom argues that both standards apply here. Mem. at 3. Because Thom "is not presenting matters outside the pleadings," *id.* at 3, and no "factual record [has been] developed" *Osborn*, 918 F.2d at 729, this is a facial challenge and so is governed by the standard set forth above. If Thom "seeks to make a factual challenge, the proper course is to request an evidentiary hearing on the issue. The motion may be supported with affidavits or other documents. If necessary, the district court can hold a hearing at which witnesses may testify." *Id.* at 730. Once evidence is presented, "if subject-matter jurisdiction turns on contested facts, the trial judge may be authorized to review the evidence and resolve the dispute on her own." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *see also Osborn*, 918 F.2d at 729.

"'claim to relief that is plausible on its face.'" *Braden v. Wal–Mart Stores, Inc*., 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Therefore, at the motion to dismiss stage, Plaintiffs' complaint "'need not include detailed factual allegations.'" *Affordable Communities of Missouri v. Fed. Nat. Mortgage Ass'n*, 714 F.3d 1069, 1073 (8th Cir. 2013) (quoting *C.N. v. Willmar Public School*, 591 F.3d 624, 629 (8th Cir. 2010)). It must only contain facts stating a claim to relief that is "plausible" on its face, that is, "'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).

## ARGUMENT

### I. This Court has Subject Matter Jurisdiction.

Thom argues that this Complaint should be dismissed on jurisdictional grounds, citing Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and requesting dismissal pursuant to Fed. R. Civ. P. 12(h)(3). Mem. at 4–7. This argument fails because Plaintiffs' claims are grounded in the Constitution, *see, e.g.*, Compl, ¶¶ 1–5, 80–92, and, as Plaintiffs properly pled, see *id.* ¶ 6, pursuant to 28 U.S.C. § 1331, federal courts have "original jurisdiction of all civil actions arising under the Constitution[.]" 28 U.S.C. §1331; *see also Arbaugh*, 546 U.S. at 503; *Bell v. Hood*, 327 U.S. 678, 681–685 (1946).

Thom argues that this Court nevertheless lacks jurisdiction because Plaintiffs have not alleged facts that can satisfy Article III standing. Mem. at 4–7. To plead Article III standing, a plaintiff must allege (1) an "injury in fact," (2) a sufficient "causal connection between the injury

and the conduct complained of," and (3) a "likel[ihood]" that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Thom contends that Plaintiffs have failed to sufficiently allege (1) an injury in fact, Mem. at 4–6, or (2) that the injury is fairly traceable to Pennington County, *id.* at 6–7. Both arguments are meritless.

### A. Plaintiffs have alleged an injury in fact.

When a challenged law "implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing." *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016) (citations omitted). "The leniency of First Amendment standing manifests itself most commonly in the doctrine's first element: injury-in-fact." *Id.* This element can be satisfied if Plaintiffs allege either "'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute [under which] there exists a credible threat of prosecution,'" *id.* (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)) or "that [they] self-censored," *id.* (citing *281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011)). Plaintiffs need to satisfy only one of these formulations. As pled in the Complaint, Plaintiffs satisfy both.

### i. Plaintiffs have adequately alleged reasonable fear of prosecution for engaging in protected speech.

First, Plaintiffs have alleged that they intend to engage in a course of conduct affected with a First Amendment interest and fear prosecution and civil liability under the Challenged Laws. *See* Compl. ¶¶ 67–70. Plaintiffs oppose construction of the Keystone XL pipeline. To express their views on this important issue, Plaintiffs intend to engage in a course of conduct affected with a First Amendment interest; specifically, to provide funding, training, and other

advice and encouragement to individuals who plan to protest the Keystone XL Pipeline. *Id.* ¶¶ 50–66.

Plaintiff Dakota Rural Action has funded, advised, and encouraged individuals to resist the pipeline and plans to organize and educate individuals to ask for denial of the pipeline's permit. *Id.* ¶¶ 53, 55–56. Plaintiffs Indigenous Environmental Network and Dallas Goldtooth are training communities along the route of the pipeline in peaceful civil disobedience and protest; funding travel for those who plan to peacefully protest the pipeline; and plan to encourage, advise, and train individuals who will set up prayer camps, protests on public highways, and use their bodies to peacefully resist the construction of the pipeline. *Id.* ¶¶ 57–59. Plaintiffs NDN Collective and Nick Tilsen have participated in and organized meetings about resisting the pipeline; are raising money to support Native-led resistance to the pipeline; and plan to promote the use of non-violent direct action, civil disobedience, prayer camps, and other forms of advocacy. *Id.* ¶¶ 61–65. Plaintiff Sierra Club has protested the construction of Keystone XL and other pipelines through non-violent civil disobedience, and Sierra Club plans to educate the public about the risks of Keystone XL; to organize lawful protests of and rallies against the pipeline; and to provide funding and other support to non-profit organizations that share its commitment to opposing the pipeline. *Id.* ¶ 66.

This course of conduct is clearly "affected with a constitutional interest": the First Amendment. Plaintiffs' speech, which concerns public issues, "occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913

(1982)). As speech about public affairs, Plaintiffs' plans reflect "more than self-expression; [they are] the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964).

Those who wish to engage in such speech but fear prosecution or civil liability for doing so "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Babbitt*, 442 U.S. at 298 (internal citations and quotations omitted). Plaintiffs "need not expose [themselves] to arrest or prosecution in order to challenge a criminal statute." *St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481, 485 (8th Cir. 2006). They need only allege a threat of prosecution that "is not imaginary or wholly speculative" to have standing. *Babbitt*, 442 U.S. at 302.

Plaintiffs have done so here. Plaintiffs allege that "[t]he trainings, funding, and other support [they] have planned for anti-pipeline protests could, if carried out, violate the Challenged Laws. Plaintiffs all 'encourage' or 'advise' participation in protests [and] . . . any protest can erupt into a riot—without any intent by Plaintiffs. At those protests, perceived unlawful violence, acts of force, or arrests may occur, even violence perpetrated by law enforcement or pipeline employees." Compl. ¶ 68. This establishes a reasonable fear of prosecution under the Criminal Laws and Sections 2 and 4 of the Riot Boosting Act, which impose civil liability for the speech criminalized by the Criminal Laws and also for compensating or soliciting others "to be arrested."

Thom essentially argues that because Plaintiffs allege that they plan to engage in constitutionally protected conduct, the law would not operate to cause them to be arrested. Mem. at 5–6 ("Plaintiffs allege they are not inciting anyone to commit imminent violent or forceful action" and that, as a result, "[t]here is no 'realistic fear of prosecution[.]'"). Plaintiffs agree that they should not be prosecuted for their conduct and that it is constitutionally protected, but they

have brought this challenge precisely because the statute is written in such a way that it could be applied to the speech and conduct Plaintiffs plan to engage in.

This is true because the type of speech that the Challenged Laws prohibit—words that "encourage, advise, direct [and] solicit"—encompasses mere advocacy and is not limited to incitement. While Plaintiffs do not intend to incite violence, they do plan to vigorously oppose construction of the pipeline. "The mere tendency of speech to *encourage* unlawful acts is not a sufficient reason for banning it." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002) (emphasis added). In fact, the Supreme Court "has made clear . . . that mere *advocacy* of the use of force or violence does not remove speech from the protection of the First Amendment." *NAACP v. Claiborne Hardware Co*., 458 U.S. 886, 927 (1982). Yet the Challenged Laws target such advocacy. Their prohibition on speech also depends on the reactions of listeners such that there is no way for Plaintiffs to know before they speak whether they will violate the Laws— whether, for example, their words will in fact encourage a listener. And the Laws are so vague that Plaintiffs cannot possibly tell what speech or conduct Defendants, including Thom, will find objectionable.

Fatally for Thom's motion, the Challenged Laws lack an intent requirement. While Thom is correct that Plaintiffs do not *intend* to incite any individuals to commit imminent violence or forceful actions and, to the contrary, plan to advocate against the use of violence, *see* Mem. at 5, the laws do not require intent. Moreover, "[a] First Amendment plaintiff does not always need to allege a subjective intent to violate a law in order to establish a reasonable fear of prosecution. *281 Care Comm. v. Arneson*, 638 F.3d 621, 629 (8th Cir. 2011). While no court has had occasion to consider a plaintiff's standing to bring a pre-enforcement challenge to a "riot boosting" law,

the Supreme Court and Eighth Circuit have considered individuals' standing to challenge laws that similarly ban words spoken in heated contexts without requiring intent. Those cases, discussed in turn below, hold that plaintiffs have standing in such circumstances and are instructive here.

In *Susan B. Anthony List v. Driehaus*, the Supreme Court held that Susan B. Anthony List ("SBA") had alleged a credible threat of prosecution under an Ohio statute prohibiting certain false statements during a political campaign notwithstanding SBA's insistence that its speech was factually true. In the proceedings below, the Sixth Circuit had reasoned that, because SBA "can only be liable for making a statement 'knowing' it is false," SBA's insistence that its speech is factually true "makes the possibility of prosecution for uttering such statements exceedingly slim." 573 U.S. at 163. This is essentially Thom's argument here. *See* Mem. at 5. The Supreme Court explicitly rejected this reasoning, explaining that standing was based not on whether the speaker subjectively believed his speech to be false under the challenged law, but rather whether the challenged law gave the government discretion to determine whether a speaker's speech was false. *Id.* The source of Plaintiffs' fear here is nearly identical: they fear arrest, prosecution, and/or civil liability not because they intend to violate the Challenged Laws, but because there is no way for Plaintiffs to tell what conduct Defendants will find objectionable.

Plaintiffs' standing is also supported by *Babbitt v. United Farm Workers*, in which the Supreme Court held that a union had standing to challenge a statute prohibiting "induc[ing] or encourag[ing]" consumers to boycott agricultural products "by the use of dishonest, untruthful and deceptive publicity" even though the union expressly did "not plan to propagate untruths." 442 U.S. 289, 301 (1979). The Supreme Court held that the union's "active[] engage[ment] in

consumer publicity campaigns in the past," its alleged "intention to continue to engage in boycott activities," the fact that "erroneous statement is inevitable in free debate," and the state's refusal to "disavow[] any intention of invoking the criminal penalty provision against unions that commit unfair labor practices" sufficed to establish the union's standing. *Id.*

Plaintiffs have alleged similar facts here. First, Plaintiffs have actively protested against the pipeline in the past and have alleged an intention to continue doing so in the future. Second, just as "erroneous statement is inevitable in free debate," *id.*, "[t]he language of the political arena, like the language used in labor disputes, is often vituperative, abusive, and inexact." *Watts v. United States*, 394 U.S. 705, 708 (1969). Statements encouraging or advising use of force may well be uttered unintentionally in the context of heated advocacy and protest. Indeed, "advocates must be free to stimulate [their] audience[s] with spontaneous and emotional appeals for unity and action in a common cause." *Claiborne Hardware Co.*, 458 U.S. at 928. Because Plaintiffs credibly allege a threat of arrest or prosecution based on similar protected speech, *Babbitt* reinforces the conclusion that Plaintiffs have standing to bring this challenge.

Eighth Circuit precedent also supports Plaintiffs' standing here. In *281 Care Committee v. Arneson*, the Eighth Circuit held that the plaintiffs had standing to challenge a law that criminalized making a false statement about a proposed ballot initiative knowingly or with reckless disregard for the truth even though they did not allege that they wished to engage in conduct that actually violated that law. 658 F. 3d at 628. The Eighth Circuit recognized that "[t]he chilling effects of [the law] cannot be understood apart from the context of the speech it regulates." *Id.* In the context of "political speech about contested ballot initiatives," it held that there is "substantially more room for mistake and genuine disagreement" about what words are

spoken with "reckless disregard for the truth." *Id.* at 629–30. "The Supreme Court has made clear that, at least when intent is not an element of a challenged statute that prohibits some category of false speech, the likelihood of inadvertently or negligently making false statements is sufficient to establish a reasonable fear of prosecution under the statute." *Id.* at 629.

As a result, the court held that plaintiffs who did not intend to make false statements but did "desire to use political rhetoric, to exaggerate, and to make arguments that are not grounded in facts" had alleged a "reasonable worry that state officials . . . will interpret these actions as violating the statute." *Id.* at 629–30. Similarly, here, Plaintiffs do not intend to incite, or even advocate for, violence. But they do desire to vigorously oppose the pipeline and engage in public debate, which, as the Supreme Court has recognized, "should be uninhibited, robust, and wide-open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Given their plans to vigorously protest, Plaintiffs' fears of prosecution cannot be deemed "imaginary" or "wholly speculative." *281 Care Comm.*, 638 F.3d at 630 (quoting *Babbitt*, 442 U.S. at 302).

Judge Kornmann's May 9, 2019 decision in *SD Voice v. Noem*, Civ. No 1:19-CV-01003-CBK (D.S.D. May 9, 2019), is particularly instructive.[2] There, as here, the plaintiffs mounted a pre-enforcement First Amendment challenge to a state statute on First Amendment grounds, and alleged in their complaint an intent to engage in conduct that could be perceived by state officials to violate a recently-enacted law. The court agreed that the plaintiffs had standing because they

---

[2] Because this opinion is not yet available on Lexis or Westlaw, Plaintiffs have attached a true and correct copy as Exhibit 1 to this memorandum.

had alleged a credible fear of prosecution. *See* Slip Op. at 14. In so holding, the court noted two significant facts that also exist here. First, the statute at issue contained an enforcement standard that was vague on its face and "not defined by [the statute] nor . . . elsewhere in South Dakota's [] laws," thus lending itself to arbitrary enforcement and chilling expression. *Id*. at 10–11. Second, the speaker could be held responsible for actions taken by a third party *over whom the speaker has no control. Id*. at 11 ("This ban on volunteer contributions is especially egregious when the ballot question committee is not affiliated with or able to supervise such out-of-state volunteers.")

Here, as in *SD Voice*, the Challenged Laws create a vague standard—"encourage, advise, direct [and] solicit"—not defined in state law. This standard invites arbitrary enforcement, thus chilling speech. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 499 (1982); *Stahl*, 687 F.3d at 1041. Second, any speaker who—in the opinion of Thom— has "encouraged" a third party to engage in a violent act can be arrested even if the speaker "is not affiliated with or able to supervise" the third party. For the same reasons the plaintiffs is *SD Voice* had standing, so do Plaintiffs here.

The single Eighth Circuit case that Thom cites to the contrary, *SOB, Inc. v. County of Benton*, is inapposite for several reasons. *See* Mem. at 6. As relevant here, in *SOB*, the Eighth Circuit considered the plaintiffs' challenge to an ordinance prohibiting "nudity and the fondling of genitals 'in a public setting or place,'" including hotels, on the grounds that it infringed their constitutional right to sexual privacy. 317 F.3d 856, 865. The Eighth Circuit held that the plaintiffs lacked standing because their alleged fear of prosecution and chill were "patently unreasonable" in light of Minnesota's canons of statutory construction, the fact that the relevant county attorney had declared that the ordinance did not prohibit any sexual activity in private

hotel rooms, and because their claim "d[id] not raise First Amendment issues." *Id.* In contrast, here, Thom has not argued that any canons of statutory construction make Plaintiffs' fear unreasonable, nor has the government disavowed prosecution of the Plaintiffs for protesting the pipeline. Perhaps most importantly, Plaintiffs' challenges in this case squarely raise First Amendment issues.

### ii. Plaintiffs have adequately alleged chill.

Plaintiffs have also alleged an injury in the form of the current, ongoing chilling of their First Amendment rights, which is sufficient to state an injury in fact. Compl. ¶ 71. For example, Sierra Club has alleged that, because of the vague wording of the Challenged Laws, it is unsure about what speech is permissible and so will err on the side of curtailing its protected speech to steer clear of what the Laws prohibit. *Id.* ¶ 66. All of the "Plaintiffs must choose between encouraging and advising pipeline protestors, on the one hand, and exposing themselves to prosecution and civil liability under the Challenged Laws, on the other." *Id.* ¶ 70.

An allegation of self-censorship is sufficient to establish standing. *See, e.g.*, *Missourians for Fiscal Accountability*, 830 F.3d at 794; *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) (holding that plaintiffs had standing to bring pre-enforcement challenge in part because of injury of chilled speech); *281 Care Comm. v. Arneson*, 638 F.3d 621, 631 (8th Cir. 2011) (same). "[W]hen there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged." *Missourians for Fiscal Accountability*, 830 F.3d at 794. "The Supreme Court has also recognized that where plaintiffs challenge a statute that allegedly chills free speech, litigants 'are permitted to challenge a statute not because their own rights of

free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *SD Voice*, Slip Op. at 15 (quoting *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956–57 (1984) (internal quotations and citations omitted).

Here, as in *SD Voice*, Plaintiffs have standing because their complaint clearly alleges they must curtail their expression out of fear of prosecution. *See SD Voice*, Slip Op. at 15 (finding standing because "compliance with the law is coerced by threat of civil or criminal enforcement penalties, [and thus] plaintiffs' injury is actual or imminent.")

### B. Plaintiffs have alleged that their injury is traceable to Thom.

Thom also contends that Plaintiffs have failed to allege that he is the source of their injury. Mem. at 6–7. This misreads the Complaint. As alleged in the Complaint, Thom "is the sheriff of Pennington County" and as such "is responsible for the prevention, detection, or prosecution of crimes [and] for the enforcement of the criminal . . . laws of the state[.]" Compl. ¶ 16 (citing SDCL § 22-1-2). Plaintiffs' injury is traceable to Thom because he is authorized and required to enforce the statute. "When a statute is challenged as unconstitutional, the proper defendants are the officials *whose role it is to administer and enforce the statute.*" *281 Care Comm.*, 638 F.3d at 631 (emphasis added). Here, Thom is that official for Pennington County.

In fact, the causation element of standing of a pre-enforcement, as-applied challenge requires Plaintiffs to name an individual, such as Thom, with the authority to enforce the challenged statute. *See Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017) ("[W]hen a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority

to enforce the complained-of provision."); *Balogh v. Lombardi*, 816 F.3d 536, 543 (8th Cir. 2016) (same).

To support his argument that Plaintiffs lack a "jurisdictional basis" for their claims, Thom cites only *Odonnell v. Harris County*, 882 F.3d 528, 538 (5th Cir. 2018). Mem. at 7.[3] *Odonnell* is distinguishable from this case. In *Odonnell*, which was decided at the summary judgment stage, Plaintiffs challenged state bail-setting procedures that led to their incarceration because the bail procedures allowed county judges to ignore individualized review of a defendant's ability to pay, the charge, and community safety. 882 F.3d at 538. The Court found that there was a municipal policy that drove the alleged constitutional violations, but because the county judges had policymaking authority on this issue and the sheriffs did not have any authority on how bail was set and were "legally obliged to execute all lawful process and [could] not release prisoners committed to jail by a magistrate's warrant" the sheriff was not a policymaker for § 1983 purposes. *Odonnell v. Harris Co*., 892 F.3d 147, 155–6. Thom stretches that holding to argue there is no municipal liability in this case because he does not have any discretion in how the Challenged Laws will be enforced.

As detailed in the following section regarding *Monell* liability, that argument is fatally flawed. These particular statutes demand interpretation in their enforcement.  In this case, the constitutional injury—whether in the form of fear of arrest and prosecution or chilled speech—is necessarily derived from how the sheriff enforces the Challenged Laws.

---

[3] The opinion cited by Thom was withdrawn and superseded by *Odonnell v. Harris Co.*, 892 F.3d 147 (5th Cir. 2018), but the language cited remained at 892 F.3d 147, 156.

## II. Plaintiffs Have Stated a *Monell* Claim

Plaintiffs' Complaint alleges that Thom has the "authority" and "duty" to enforce the Challenged Laws. Compl. ¶ 16. That allegation is sufficient to support a claim for liability under § 1983 in the context of this case. For claims arising under 42 U.S.C. § 1983, "a plaintiff must allege [1] the violation of a right secured by the Constitution and laws of the United States, and must show [2] that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Plaintiffs have alleged First Amendment violations and Thom is a person within the meaning of the statute.

"[Governmental] liability under § 1983 attaches where . . . a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. at 469, 483 (1986). *See also Soltesz v. Rushmore Plaza Civic Center*, 847 F.3d 941, 946 (8th Cir. 2017) (quoting *Pembaur* for this principle); *Malone v. Hinman*, 847 F.3d 949, 955 (8th Cir. 2017) (recognizing that a "policy" for purposes of governmental liability "'is an official policy, a deliberate choice or a guiding principle or procedure made by the municipal official who has final authority regarding such matters.'") (quoting *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999)).

A municipality or county may be liable under Section 1983 if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692 (1978). As Thom concedes, *see* Mem. at 7–8, the Eighth Circuit has expressly reserved the question of what circumstances may render a municipality "liable for enforcing state law." *Slaven v. Engstrom*,

710 F.3d 772, 781 n.4 (8th Cir. 2018); *see also Duhe v. City of Little Rock*, 902 F.3d 858, 863 n.2 (8th Cir. 2018) (again declining to "take up th[e] issue" of municipal liability for enforcing state law). The prevailing view "is that a local government's exposure to *Monell* liability for enforcing state law turns on the degree of discretion the local government retains and whether the locality has made its own deliberate choices with respect to the law." *Bruce & Tanya Assocs. v. Bd. of Supervisors*, 355 F. Supp. 3d 386, 400, n.6 (E.D. Va. 2018) (collecting cases).

As discussed in detail below, Pennington County's policies, South Dakota law, and the vague terms of the Challenged Laws all present Thom with alternatives on how to enforce the Criminal Laws and, in choosing how to enforce those laws, he is the ultimate policymaker for Pennington County.

**A. Thom has Discretion Regarding Enforcement of the Challenged Laws.**

Thom's argument boils down to his contention that there is no municipal policy here, but only a state law that he is required to enforce pursuant to SDCL 7-12-4. But Thom's own actions contradict his argument. Thom's office maintains a handbook of official policies, all of which were expressly approved by Thom. *See* Pennington County Sheriff's Office, *Law Enforcement Policies*, Policy 112-03: Criminal Process (Apr. 2, 2019), full document found at https://docs.pennco.org/docs/SO/policies/lepolicies.pdf, excerpt attached as Exhibit 2.[4] Arrest for violation of criminal laws in Pennington County is governed by Policy 112-03, which clearly

---

[4] The Court may consider the Pennington County Sheriff's Office's policies because they are public records, which may be considered when deciding a 12(b)(6) motion. *See, e.g.*, *United States el rel. Kraxberger v. Kan. City Power & Light Co.*, 756 F.3d 1075, 1083 ("[I]n a motion to dismiss, a court may consider 'matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record.'").

gives Thom's department discretion to enforce the law. Ex. 2, Handbook, p. 3. The Policy

includes an entire section entitled "Use of Discretion." *Id.* It states, in full:

> 1. A deputy shall responsibly use the discretion vested in the position and exercise it within the law. The principle or [*sic*] reasonableness shall guide the deputy's determination and the deputy shall consider all surrounding circumstances in determining whether any legal action shall be taken.

> 2. Consistent and wise use of discretion, based on professional policing competence, will do much to preserve good relationships and retain the confidence of the public. There can be difficulty in choosing between conflicting courses of action. It is important to remember that a timely word of advice rather than arrest—which may be correct in appropriate circumstances— can be more effective means of achieving a desired end.

*Id.* (emphasis added). This policy expressly recognizes "the discretion vested in" Thom's

department and that his officers must "choos[e] between conflicting courses of action." *Id*. This

applies to Thom's enforcement of the challenged Criminal Laws.

Additionally, Thom's policy manual strongly suggests that Pennington County has

already developed, or is developing, written policies specific to the Challenged Laws. Policy

531-01: Unusual Occurrences Administration states "[t]he Pennington County Sheriff's Office

will have written plans for responding to unusual occurrences," including "civil unrest" and

"riot." Ex. 2, Handbook, p. 5. Assuming Thom follows his own publicly available policy

handbook, he likely has developed "riot" and "civil unrest" policies relevant to the enforcement

of the Challenged Laws, which policies will be produced in discovery. In addition, the fact that

Thom's office can create such policies demonstrates that he is a policy maker under the *Monell*

framework. The Handbook shows that "the locality has made its own deliberate choices with

respect to the law." *Bruce & Tanya Assocs.*, 355 F. Supp. 3d at 400, n.6.

Further contradicting his argument that he is "required" to enforce all state laws without

any exercise of discretion, Thom's office explicitly stated in the press – only a week before filing

18

his opposition brief in this case – that it will not follow opinions of the Attorney General with respect to CBD oil. *County prosecutor says he won't prosecute CBD oil cases*, Keloland.com, April 16, 2019, https://www.keloland.com/news/local-news/county-prosecutor-says-he-won-t-prosecute-cbd-oil-cases/1931540510 ("State Attorney General Jason Ravnsborg recently sent a release that said industrial hemp and all forms of CBD oil remain illegal in South Dakota. Pennington County State's Attorney Mark Vargo tells the Rapid City Journal that he came to his decision after speaking with Ravnsborg's staff and examining relevant state laws. Pennington County Sheriff Kevin Thom and Rapid City Police Chief Karl Jegeris say will be following Vargo's direction and won't arrest people for CBD oil.").[5] This strongly contradicts Thom's arguments regarding the "requirements" of SDCL 7-12-4.

In reality, Thom has wide discretion on whether and how those laws are enforced, placing him in the role of a policy maker. This comports with the state's "public duty doctrine," which broadly states that a municipality or city "owe[s] no duty to provide public services to particular citizens as individuals. Instead, ... the District's duty is to provide public services to the public at large" and "[b]ecause an officer's duty is to the public, his subsequent "failure to perform it, or an inadequate or erroneous performance, must be a public and not an individual injury, and must be redressed, if at all, in some form of public prosecution." *McGaughey v. D.C.*, 734 F. Supp. 2d 14, 18 (D.D.C. 2010) (internal citations omitted). South Dakota has not abrogated the public duty doctrine. *Gleason v. Peters*, 568 N.W.2d 482, 484–86 (S.D. 1997). Its function is to "protect[] government officials against a "novel sort of professional malpractice" by shielding *their*

---

[5] The Court may also consider the Pennington County Sheriff's Office's statements because they are matters of public record. *See, e.g.*, *Kraxberger*, 756 F.3d at 1083.

*discretionary decisions and actions taken in an official capacity from suit.*" *McGaughey* at 18 (emphasis added). With the adoption of this doctrine, South Dakota recognizes that law enforcement decisions necessarily involve discretion.

**B. Because the Challenged Laws are Vague, Pennington County Necessarily Must Adopt a Policy Regarding How to Enforce Them.**

Plaintiffs allege that the Challenged Laws are unconstitutionally vague. Compl. ¶¶ 22, 44. To implement them, Thom may be called upon to make dozens if not hundreds of decisions, each one reflecting a choice that likely creates a municipal policy. Thom, for instance, may have to decide whether each person who urges others to attend an event opposing construction of the pipeline, including Plaintiffs, are "riot boosters" if the event turns violent. These laws are *not* clear on their face and they *require* interpretation.

For example, assume by way of hypothetical that Plaintiff Tilsen, a resident of Pennington County, encourages those in his county who live along the route of pipeline construction to join him in a protest in Pennington County and encourages them to bring friends. One of his neighbors, in turn, sends her nephew in Nebraska $25 to drive to the site to participate in the protest. At the protest, the nephew engages in violence and is arrested. Under the Challenged Laws, is Mr. Tilsen liable because he encouraged his neighbors to invite their friends? Is the aunt liable for having solicited her nephew to join the protest? The answer to those questions depends in the first instance on how Thom interprets the Challenged Laws. Regardless

of which choice Thom makes, he will create a *policy* based on *his interpretation* of state statutory law.[6]

Where municipal policymakers like Thom have discretion in interpreting and implementing a vague state law, the choices they make in doing so gives rise to municipal liability. *See Pembaur*, 475 U.S. at 483; *Soltesz*, 847 F.3d at 946. Even assuming that Thom's enforcement of the Laws is mandatory, *how* he chooses to enforce the Laws "still leaves room for [him] to set local policy"—for example, how he interprets "encourages" or "advises" and who he chooses to arrest, as illustrated by the example above. *See Snyder v. King*, 745 F.3d 242, 249 n.3 (7th Cir. 2014) (holding that "even if the [state] code provision authorizing county sheriffs to perform a strip search of all inmates entering a county jail is read to make a strip search mandatory, it still leaves room for the sheriffs to set local policy with respect to the level of intrusiveness involved and the manner in which the search is conducted."). Those "independent decisions . . . could easily be the difference between an unconstitutional [implementation] and one which was not." *Id.*

A single decision by a policymaker can subject the government to § 1983 liability. *Id.* at 480–81; *see also Soltesz*, 847 F.3d at 946 ("Thus a single decision by a municipal official can constitute official policy."). The fact that many of Thom's applications and interpretations of the Challenged Laws may be oral and not written does not impact municipal liability. *See Monell v.*

---

[6] This vagueness reinforces the concrete harms suffered by Plaintiffs that establish their standing. Due to the vagueness and potential breadth of the Challenged Laws, both Mr. Tilsen and the aunt in this hypothetical may reasonably fear prosecution and may engage in self-censorship. Indeed, the Riot Boosting Act was intended to create this type of intimidation based on a speaker's viewpoint. Compl. ¶ 28 ("The Act targets anti-pipeline protests and protestors. Governor Noem cited George Soros as an example of an out-of-state entity that the State wanted to shut down, and block from disrupting the construction of the pipeline, through the Act.")

*Dep't of Soc. Servs. of New York*, 436 U.S. 658, 694 (1978) (holding that a challenged policy must be "made by its lawmakers or by those whose edicts *or acts* may fairly be said to represent official policy[]") (emphasis added); *see also Pembaur*, 475 U.S. at 480–81 (holding that an "official policy" for purposes of § 1983 liability "refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time[]").

Plaintiffs are not only challenging the statutes on their faces, that is, as a matter of statutory construction, they are also challenging how the Laws will be applied to them at the county level. Those applications will be the result of implementations of county policy. *See Oglala Sioux Tribe v. Van Hunnik*, 993 F. Supp. 2d 1017, 1029 (D.S.D. 2014), *reversed on other grounds*, 904 F.3d 603 (8th Cir. 2018) (denying county official's motion to dismiss where the county instituted policies, practices and customs to implement the state law and had discretion with respect to how the state law was carried out).

### C. The Cases Cited by Thom Address Compulsory, Not Discretionary Enforcement of State Law.

Each case Thom cites deals with municipalities acting under "compulsion of state law." *See* Mem. at 7. Because, as discussed at length above, Thom has discretion in whether and how to enforce the Challenged Laws, his reliance on these cases is misplaced.

In *Slaven*, decided under the summary judgment standard,[7] the "complaint essentially allege[d] that *[state] law*, . . .—not an independent [county] policy—caused the [constitutional]

---

[7] The summary judgment standard is whether the Defendant is entitled to judgment as a matter of law, versus the standard for a motion to dismiss, which is whether, taking the facts alleged by plaintiffs as true, the complaint fails to state a claim for relief.

violations." The court found that municipal officials had no choice but to enforce the law as it was written and so held that the plaintiffs needed to sue state, not county, officials. *Slaven v. Engstrom*, 710 F.3d 772, 780–81; *see also Slaven*, 848 F. Supp. 2d 994, 1006–07. Here, Plaintiffs are suing state officials for their *facial* challenge and are suing—and have a right to sue—Thom because he is mandated to interpret and apply these confusing and imprecise statutes in Pennington County.

Thom next cites *Vives v. City of New York*, 524 F.3d 346, 351 (2d Cir. 2008). *See* Mem. at 7–8. In that case, the Second Circuit decided that the existence of a municipal policy depends on "1) whether the City had a meaningful choice as to whether it would enforce [the state statute in question]; and 2) if so, whether the City adopted a discrete policy to enforce [the state statute in question] that represented a conscious choice by a municipal policymaker." *Vives*, 524 F.3d at 353. Thom has discretion under the Challenged Laws, triggering municipal liability. He also has the power to implement discrete policies to police riots that occur within Pennington County.

Thom also cites Seventh Circuit opinions in *Surplus Store & Exchange Inc. v. City of Delphi*, 928 F.2d 788 (7th Cir. 1991) and *Bethesda Lutheran Homes & Services, Inc. v. Leean*, 154 F.3d 716 (7th Cir. 1998). Mem. at 7. Again, these cases were decided under the standard for summary judgment where the parties had an opportunity to develop the facts and they both articulate the rule that a county "cannot be held liable under Section 1983 for acts that it did *under the command* of state or federal law." *Id.* (emphasis added). Enforcement of the Challenged Laws is discretionary for Pennington County, not mandatory. The crucial fact of discretion afforded to Pennington County regarding its enforcement of the Challenged Laws triggers municipal liability.

## CONCLUSION

For the reasons stated, Plaintiffs request that the Court deny Thom's Motion to Dismiss.[8]

Dated this 14th day of May, 2019

Respectfully submitted,

/s/ Brendan V. Johnson
Brendan V. Johnson (SD Bar # 3263)
Erica A. Ramsey (SD Bar # 4901)
Timothy W. Billion (SD Bar # 4641)
ROBINS KAPLAN LLP
140 North Phillips Ave, Suite 307
Sioux Falls, SD 57104
Tel: 605-335-1300
BJohnson@RobinsKaplan.com
ERamsey@RobinsKaplan.com
TBillion@RobinsKaplan.com

Courtney Bowie*
American Civil Liberties Union of South
Dakota
P.O. Box 1170
Sioux Falls, SD 57101
Tel.: 201-284-9500
cbowie@aclu.org
*Admitted pro hac vice

Vera Eidelman*
American Civil Liberties Union
Foundation
Speech, Privacy, and Technology Project
125 Broad St.
New York, NY 10004
Tel.: 212-549-2500

---

[8] If the Court agrees with Thom's argument that the *Monell* claim does not include sufficient allegations of county policy, the Plaintiffs request that they be permitted to amend the Complaint to include specific allegations regarding Pennington County's discretion and intention to enforce the Challenged Laws against the Plaintiffs.

veidelman@aclu.org
*Admitted pro hac vice

Stephen Pevar (SD Bar #1364)
American Civil Liberties Union
Foundation
765 Asylum Avenue
Hartford, CT 06105
Tel.: 860-570-9830
spevar@aclu.org