## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH DAKOTA
## WESTERN DIVISION

| | |
|---|---|
| DAKOTA RURAL ACTION, DALLAS GOLDTOOTH, INDIGENOUS ENVIRONMENTAL NETWORK, NDN COLLECTIVE, SIERRA CLUB, and NICHOLAS TILSEN,<br><br>    Plaintiffs,<br><br>vs.<br><br>KRISTI NOEM, in her official capacity as Governor of the State of South Dakota, JASON RAVNSBORG, in his official capacity as Attorney General, and KEVIN THOM, in his official capacity as sheriff of Pennington County,<br><br>    Defendants. | Case No.: 5:19-cv-5026<br><br>**PLAINTIFFS' COMBINED RESPONSE TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, FOR CERTIFICATION TO THE SOUTH DAKOTA SUPREME COURT, AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

## INTRODUCTION

South Dakota Codified Laws §§ 22-10-6 and 22-10-6.1 (together, "Criminal Laws") criminalize speech that encourages—but does not incite—others to take lawless action, and South Dakota S.B. 189, 2019 Leg. Session (S.D. 2019), to be codified in South Dakota Codified Laws § 20-9-1, *et. seq*. ("Riot Boosting Act" or "Act") (collectively, "Challenged Laws" or "Laws"), imposes civil liability for the same speech. Plaintiffs challenge these laws and have sought a preliminary injunction because they violate the First and Fourteenth Amendments in four ways. First, the Challenged Laws are content-based restrictions on expression that are not narrowly tailored to achieving any compelling government interest. Second, even assuming that the Laws prohibit a narrow band of speech that is not constitutionally protected—namely,

incitement—they are unconstitutionally overbroad because incitement is a tiny fraction of the speech reached and proscribed by these Laws. Third, the Act violates the First Amendment right of association by exposing organizations to civil liability for "encouraging" others to acts of force or violence without requiring that the organizations had authority over, or actually knew about and ratified, any unlawful act. Finally, the Challenged Laws—which must satisfy an exacting requirement of clarity because they regulate speech—are impermissibly vague because they lack a *mens rea* requirement and punish speech based on the reaction it causes in others.

Defendants Noem and Ravnsborg (together, "State Defendants") oppose Plaintiffs' motion for preliminary injunction. They have filed a motion for judgment on the pleadings or, in the alternative, certification to the South Dakota Supreme Court (Dkts. ## 27-29), joined in subsequent filings (*see* Dkts. ## 30–32) by Defendant Thom[1] (collectively "Defendants"). Although Defendants claim that the Challenged Laws do not infringe on protected speech, they do not contest that, to satisfy the Constitution, the Criminal Laws must reach only speech that is (1) intended and (2) likely to cause (3) imminent violence, nor that the Riot Boosting Act, a civil law, can only reach speech that additionally (4) actually results in violence.

Instead, Defendants argue only that the Challenged Laws include each of these elements. This misreads the plain language of the Challenged Laws, not one of which mentions intent, identifies or limits the moment when the proscribed speech must be uttered, or requires that any

---

[1] Defendant Thom has yet to file an answer to Plaintiffs' Complaint. Under Federal Rule of Civil Procedure 7(a), the pleadings include a complaint and an answer so that "the pleadings are closed for the purposes of Rule 12(c) once a complaint and answer have been filed." *Doe v. United States*, 419 F.3d 1058, 1061 (9th Cir. 2005). Therefore, Defendant Thom's Motion for Judgment on the Pleadings (Dkts. ##30-32) also should be denied for procedural reasons, as he has not yet filed an answer. *See Crow Creek Sioux Tribe v. Donovan*, No. Civ. 09-3021-RAL, 2009 WL 4730696, at *2-3 (D.S.D. Dec. 9, 2009) (denying a motion for judgment on the pleadings because it was filed before an answer).

act of force or violence be likely to or actually occur as a result of the speech. Indeed, given the plain language of these statutes, their reach could not be broader, in that they regulate speech that "directs, advises, encourages, or solicits"—but notably not "incites"—particular actions. Thus, Defendants are not asking this Court to *interpret* the Challenged Laws; Defendants are asking the Court to *rewrite* them.

Additionally, even assuming the Court were to read the statutes in the manner Defendants propose, the Challenged Laws would still improperly interfere with protected speech. Defendants' argument can cure neither the overbreadth of Section 4 of the Act, which unconstitutionally prohibits "solicit[ing] or compensat[ing]" another "to be arrested," nor the Act's unconstitutional infringement of associational rights. Therefore, for the reasons set forth in this memorandum, Defendants' motions for judgment on the pleadings or, in the alternative, certification to the South Dakota Supreme Court should be denied and Plaintiffs' Motion for Preliminary Injunction should be granted.

## ARGUMENT

### I.      The Challenged Laws Are Content-Based Regulations Subject to Strict Scrutiny.

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). Sometimes, the content-based nature of a law is "obvious, defining regulated speech by particular subject matter"; other times, it is "more subtle, defining regulated speech by its function or purpose." *Id.* "Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.*

The Challenged Laws are content-based because they regulate speech on the basis of its message. They "describe[] impermissible [speech] not in terms of time, place, and manner, but in

terms of subject matter." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 99 (1972). Namely, the Laws apply to any and all speech that advocates for the use of force or violence— speech that the Supreme Court has held is protected by the First Amendment. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982) (recognizing "that mere *advocacy* of the use of force or violence does not remove speech from the protection of the First Amendment"); *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002) (holding that "[t]he mere tendency of speech to *encourage* unlawful acts is not a sufficient reason for banning it.") (emphasis added). Indeed, these Laws broadly prohibit a speaker from saying *anything* that in the minds of jurors might be viewed as "encouraging" a listener to commit an act of force or violence.

Defendants' assertion that the Challenged Laws do not regulate speech on the basis of its content because they do not specifically target pipeline protests and instead "apply to all riot boosting" misses the mark. (Dkt. #28 at 28).[2] Indeed, Defendants' own words prove the point: in recognizing that the statute is directed at "riot boosting," they concede that the Laws are content-based restrictions on speech. Therefore, the statute must be subjected to strict scrutiny, a test these Laws cannot pass because they are not narrowly tailored to any compelling government interest, including any served by prohibiting "incitement" speech.

The Supreme Court has made clear that laws restricting a speaker's ability to advocate for illegal behavior are content-based. *See, e.g.*, *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382–83 (1992); *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 127 (1991) (Kennedy, J., concurring) ("There are a few legal categories in which *content-*

---

[2] Contrary to Defendants' arguments, Plaintiffs have not claimed that the Challenged Laws are content-based because the State announced that the Riot Boosting Act was a response to prior pipeline protests. (*Id.* at 28-29). Rather, the Challenged Laws are content-based regulations because they prohibit speech on the basis of its content.

4

*based regulation* has been permitted or at least contemplated. These include . . . incitement[.]")
(emphasis added). While a small sliver of such speech can be restricted under the First
Amendment—specifically, speech that rises to the level of incitement—that sliver must be "well-
defined and narrowly limited." *United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (quoting
*Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942)). As explained in Plaintiffs'
Memorandum in Support of Their Motion for Preliminary Injunction, and as discussed below,
accepting Defendants' arguments here would stretch the area of incitement past the breaking
point. As such, the Challenged Laws do not fall into the narrow incitement exception to
protected speech and are improper content-based speech regulations.

II.   **The Challenged Laws Are Not Incitement Statutes and so Fail Strict
      Scrutiny.**

Defendants do not dispute that the Challenged Laws should be analyzed under the test the
Supreme Court set forth in *Brandenburg v. Ohio*, 395 U.S. 444 (1969). (Dkt. # 28 at 22-23).
Moreover, they concede that *Brandenburg* prevents them from regulating speech that advocates
for lawless behavior "*except where such advocacy is directed to inciting or producing imminent
lawless action and is likely to incite or produce such action*." (*Id.* (citing *Brandenburg*, 395 U.S.
at 447)) (emphasis in original). Instead, Defendants argue that the Challenged Laws satisfy this
standard by presumptively including the elements of intent, imminence, and likely causation.
This argument lacks merit, however, because on their faces the Laws do not include *any* one of
these prerequisites, much less all three. To conclude otherwise, this Court would have to rewrite
the Challenged Laws.

A.   **The Challenged Laws Target Mere Advocacy.**

The Supreme Court has held that speech that encourages, advises, directs, or solicits acts
of force or violence, without more, is protected. In *Brandenburg* itself, which Defendants agree

should govern this case, the Supreme Court held that a law criminalizing "advocat[ing] or teach[ing] the duty, necessity, or propriety of violence" regulated protected speech. *Brandenburg*, 395 U.S. at 449. The Court determined that the statute—which, much like the Challenged Laws, prohibited advocating for others to engage in violence—"punish[es] mere advocacy" and so "falls within the condemnation of the First and Fourteenth Amendments." *Id. Brandenburg*, 395 U.S. at 449; *see also Claiborne Hardware Co.*, 458 U.S. at 927 (recognizing that "mere *advocacy* of the use of force or violence" is protected by the First Amendment); *Ashcroft*, 535 U.S. at 253 (recognizing that speech that has the "mere tendency . . . to encourage unlawful acts" is protected by the First Amendment).

Courts around the country have reached similar conclusions regarding speech that encourages, advises, directs, or solicits unlawful behavior more broadly. *See United States v. Sineneng-Smith*, 910 F.3d 461, 467 (9th Cir. 2018) (invalidating statute that prohibited speech that "encourages or induces an alien to come to, enter, or reside in the United States"); *State v. Melchert-Dinkel*, 844 N.W. 2d 13, 23–24 (Minn. 2014) (invalidating prohibition on speech that "advises" or "encourages" another to commit suicide); *Nat'l Gay Task Force v. Bd. of Educ. of City of Oklahoma City*, 729 F.2d 1270, 1274 (10th Cir. 1984), *aff'd sub nom. Bd. of Educ. of City of Oklahoma City, Okl. v. Nat'l Gay Task Force*, 470 U.S. 903 (1985) (invalidating statute that prohibited "advocating, soliciting, imposing, encouraging or promoting public or private homosexual activity," which was illegal at the time).

Defendants insist that the Laws' "string of operative verbs" inherently requires "a level of advocacy above mere suggestion or strategizing[.]" (Dkt. #28 at 24). Defendants argue that the Laws therefore satisfy the first prong of the *Brandenburg* test as articulated by the Sixth Circuit: that "the speech explicitly or implicitly encouraged the use of violence or lawless action." (*Id.* at

6

23 (quoting *Nwanguma v. Trump*, 903 F.3d 604, 609 (6th Cir. 2018)). As noted in *Nwanguma*, however, there is a difference between speech that "ha[s] a tendency to encourage unlawful use of force" and that which "specifically advocate[s] for listeners to take unlawful action." 903 F. 3d at 610. The Challenged Laws fail to distinguish between the two. Their imposition of liability on speech that "directs, advises, encourages, or solicits" acts of force or violence applies—on their face—to *any* speech that a jury finds encouraged some third party to engage in lawless action. Simply stated, under the Challenged Laws, a person who two years ago in Boston, Massachusetts said nothing more than "We should oppose additional pipelines with everything we have" could be sanctioned under the Laws today.[3]

### B.       The Challenged Laws Do Not Include an Intent Requirement.

In addition, the Challenged Laws impose liability on a speaker regardless of her intent. Noticeably absent from the Laws' plain language—which regulates speech that "directs, advises, encourages, or solicits other persons participating in [a] riot to acts of force or violence"—is any requirement that the speaker *intend* for her speech to cause the prohibited result.

As Defendants state in their brief, "[t]he starting point when interpreting a statute must always be the language itself." (Dkt. # 28 at 10). Yet, based on their plain language, the Challenged Laws are unconstitutional because they fail to contain a scienter requirement. Defendants are forced to make two unsupportable arguments in their effort to overcome this flaw, neither of which is availing.

---

[3] As discussed further below, if the Court finds that the Laws proscribe incitement even though they lack the three elements required under *Brandenburg*, the Laws are nevertheless overbroad because they reach far beyond that narrow band of unprotected speech.

1.     **Supreme Court Precedent Establishes that Speech that Directs, Advises, Encourages, or Solicits Does Not Inherently Include the Element of Intent.**

First, Defendants argue that the definitions of "directs, advises, encourages, or solicits" include a "level of direction . . . so that a speaker must intend to direct, influence, or control the conduct of those to whom he or she is speaking." (Dkt. #28 at 25). Defendants do not offer any case citations to support this argument—nor could they, because such an argument is foreclosed by Supreme Court precedent.

When considering statutes that criminalize speech that "advocates" or "advises," the Court has held that those words, which describe the effect of the speech, cannot be read to necessarily describe its intent. Indeed, in *Brandenburg* itself, the Supreme Court held that, "by its own words," a statute's criminalization of "advocating the duty, necessity, or propriety of . . . violence" failed to satisfy the test for a proper incitement statute, including requiring the element of intent. 395 U.S. at 448–49. Similarly, in *Keyishian v. Board of Regents*, the Supreme Court noted that a law making "advocacy of [violent overthrow of the government]" a felony, including by displaying literature that "advocat[es], advis[es], or teach[es] the doctrine," failed constitutional scrutiny in part because it did not make clear that such advocacy is "intended to . . . incite to action." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 599 (1967).

And, more than 100 year ago, the Supreme Court rejected the idea that words like "advise" and "encourage" contain an inherent element of intent, even when used to incite another to force or violence. *See Hicks v. United States*, 150 U.S. 442 (1893). In *Hicks*, the Court examined whether a defendant could be convicted of aiding and abetting a crime for having "advis[ed] or encourag[ed]" another man to commit a violent act. *Id*. at 448. The Court held that

a conviction for aiding and abetting, which, like incitement, requires an element of intent, could not be sustained in the absence of a finding that the defendant intended for his speech to encourage another person to engage in violent, unlawful behavior. *Id*. at 449.

In reaching this holding, the Court explicitly rejected the trial court's instruction to the jury that "[i]f the deliberate and intentional use of words was the effect to encourage one man to kill another, he who uttered these words is presumed by the law to have intended that effect, and is responsible therefor." *Id.* Here, Defendants ask this Court to do precisely what the Court in *Hicks* rejected: read a scienter requirement into words that do not inherently contain one. In *Hicks*, the Court admonished that even where there is "no doubt [that a speaker] intended to use the words he did use," the question of whether "he thereby intend[ed] that they were to be understood by [a listener] as an encouragement to act" remains open; "the words may have been used for a different purpose" and "the effect of [the defendant's] words may have had the result of encouraging [the unlawful act], regardless of [the defendant's] intention." *Id*. Thus, Defendants' argument that the Challenged Laws inherently require an element of intent simply because they restrict speech that "directs, advises, encourages, or solicits" fails.  It makes no difference that "advise" and "encourage" are coupled with other, similar words because all of them suffer from this flaw.

### 2.     Speech that Directs, Advises, Encourages, or Solicits Does Not Inherently Include the Element of Intent Under South Dakota Law.

Defendants also argue that, because the South Dakota Supreme Court construed the statute proscribing riot as containing a scienter requirement, this Court should read a similar requirement into the Challenged Laws. (Dkt. #28 at 25). First, Defendants appear to argue that *Brandenburg*'s intent requirement is satisfied because the Challenged Laws prohibit speech that encourages listeners who are "participating in [a] riot" and *participation* is an intentional act

under the state's definition of "riot." (Dkt. # 28 at 10). This conflates the intent that matters under *Brandenburg*. The relevant intent is that of the speaker to incite a listener, not of the listener to participate in a riot or to subsequently engage in force or violence. *See Sineneng-Smith*, 910 F.3d at 477 ("the relevant inquiry is the conduct of the [speaker], and not the [listener].").

Defendants' second, and main, intent argument is that, because the South Dakota Supreme Court read intent into the riot statute in *State v. Bad Heart Bull*, 257 N.W.2d 715 (S.D. 1977), and *State v. Means*, 268 N.W.2d 802 (S.D. 1978), this Court should similarly interpret the Challenged Laws to include intent—even though *no* language about any *mens rea* requirement appears in the statutes. (Dkt. #28 at 7-10). This Court is not permitted to take such a gargantuan leap, nor should it.

Defendants' argument fails for two reasons. First, the logic that *Bad Heart Bull* and *Means* applied to SDCL § 22-10-1—which criminalizes "[a]ny use of force or violence or any threat to use force or violence, if accompanied by immediate power of execution, *by three or more persons acting together* and without authority of law," *id.* (emphasis added)—cannot extend to the language of the Challenged Laws. Contrary to Defendants' characterization (*see* Dkt. # 28 at 7), the *mens rea* question before the court in *Bad Heart Bull* was directed not at SDCL § 22-10-1, but at a separate law—SDCL § 22-10-3, a since-repealed statute regulating felonies, including arson, committed at a riot.  In the decision, the court considered the intent required by the riot statute to aid in its analysis of SDCL § 22-10-3. Because SDCL § 22-10-1 requires at least three people to be "acting together," the court concluded that the crime cannot be committed without the mutual intent to do so and determined that, under SDCL § 22-10-1, "[t]he state is only obligated to prove the common or mutual intent of the group." *Id.*

10

The court did not expand upon this analysis in *State v. Means*. Again asked to consider the constitutionality of SDCL § 22-10-1, the Court affirmed its decision in *Bad Heart Bull* and, to avoid "encumber[ing] th[e] record with selective repetition from [that case]," instead "briefly summarized it. 268 N.W.2d at 808. The language upon which Defendants heavily rely—"where criminal intent is an essential element of the crime, but is not made so by express statutory language, it will be implied"—comes from this summary. *Id*. Placed in context, this sentence clearly stands only for the reasoning of *Bad Heart Bull* that when three or more persons "act[ ] together," they necessarily share an intent. Thus, *Means* emphasizes that intent is "essential" to the riot statute as the legislature had defined it; *Means* use of "essential" does not suggest that courts should read intent in to any South Dakota statute that lacks intent on its face and where such a *mens rea* element would be "essential" to withstanding constitutional challenge.

The reasoning of *Bad Heart Bull*, summarized in *Means*, cannot apply to the Challenged Laws. Unlike SDCL § 22-10-1, the Challenged Laws do not require the regulated person—the speaker of encouraging words—to "act[] together" with anyone; thus, there is no presumptive agreement, and no presumptive intent. While the Laws contemplate two people—a speaker and a listener—the two need not share a common purpose in order to violate the Challenged Laws. Indeed, the speaker and the actor need not even be in the same place at the same time, or be known to one another. It is enough that a speaker, acting alone, makes a comment that a listener independently finds encouraging. As discussed at length above, it is possible to encourage or advise another person to engage in unlawful behavior without having the intent to do so. *See Hicks*, 150 U.S. 442.

Second, fatal to Defendants' theory, the state Supreme Court refused to apply Defendants' proposed logic to any statute except SDCL § 22-10-1 in *Bad Heart Bull* itself. When

the Court turned back to the *mens rea* element of SDCL § 22-10-3, the felony-riot statute, which was actually at issue, it did not hold that intent was inherent in that statute. Instead, the Court held that "[t]o satisfy constitutional due process it was only necessary for the state to prove that one or more of the rioters, in the course of the riot intended to, and did" violate the law. *Id.* at 719–20. This difference in analysis alone shows that the South Dakota Supreme Court has refused to read intent into the face of every riot-related statute.

The language in *Means* does not undermine this conclusion. Indeed, the fact that *Bad Heart Bull* stands only for recognizing intent on the face of SDCL § 22-10-1 was emphasized in *State v. Kane* when the South Dakota Supreme Court also declined read intent into the face of regulations of speech, including SDCL § 22-10-6, which Plaintiffs challenge here. Notably, in *State v. Kane*, the court held that SDCL §§ 22-10-1, 22-10-4, and 22-10-5 did not raise First Amendment concerns because those statutes did not contemplate liability for mere advocacy, but expressly declined to hold the same for SDCL § 22-10-6. *State v. Kane*, 266 N.W.2d 552, 555-56 (S.D. 1978), *overruled on other grounds by State v. Smith*, 353 N.W.2d 338 (S.D. 1984).  The court held that SDCL §§ 22-10-1, 22-10-4, and 22-10-5 did not make "persons liable because of their causal rather than active role," but noted that "[w]hether [that issue] would come into play in a case involving a violation of SDCL §§ 22-10-6" was "not before" the court. *Id*. at 556.

The distinction between analysis of laws regulating conduct at a riot and laws regulating speech in some way related to a riot can also be seen in Chief Judge Nichol's ruling in *United States ex rel. Means v. Solem*, 440 F. Supp. 544 (D.S.D. 1977)—the federal case brought by the defendant in *State v. Means* to challenge the conditions of his bail while he appealed his criminal conviction under the riot statutes. *Id*. at 550. Specifically, defendant Means challenged the condition that forbade him from making speeches or writing letters on behalf of the American

Indian Movement. *Id.* Chief Judge Nichol held that this condition violated Means' First
Amendment rights by regulating "not only conduct in certain situations[,]" like the behavior
regulated by SDCL § 22-10-1, but also "the exercise of 'pure speech[,]'" like the speech
regulated by the Challenged Laws. *Id.* Judge Nichol held that a "restriction . . . on 'mere
advocacy' . . . would be an unconstitutional infringement of the First Amendment." *Id.* at 550.
For the same reason, Defendants' argument—that the South Dakota Supreme Court's analysis of
the crime of riot leads to the conclusion that the Challenged Laws are constitutional—fails.

### C.     The Challenged Laws Do Not Require Imminence.

While the lack of intent is alone fatal to the Challenged Laws, the laws also fail First
Amendment scrutiny because they do not contain language that makes clear that when a speaker
"encourages" violent action, such action must be able to occur "imminently." *See Brandenburg*,
395 U.S. at 447. The plain language of the Challenged Laws contemplates two moments of time:
the moment the speaker speaks and the moment the listener feels encouraged. Nothing in the
statutory language requires that those two moments occur at once—or even anywhere close in
time.

Defendants claim that the Challenged Laws satisfy *Brandenburg*'s imminence
requirement by imposing liability only on speech made while a riot is occurring. (Dkt. #28 at 10–
11, 25–26). This misreads the Laws' plain language, which requires only that a speaker must, at
some point, utter speech that, at some point, makes a person "participating in [a] riot" feel
encouraged. The plain text of the Laws does not address whether those points must be the same,
when such words must be spoken, or how imminent the encouraging effect of the words must be.
To illustrate, if someone "participating in a riot" was encouraged by a speech made months
prior—or even by a book published years earlier exposing the environmental hazards of

developing fossil fuels—that speaker is guilty of "riot boosting" according to the plain text of these Laws.

The conclusion that the two moments in time need not be the same moment is bolstered by the fact that, as State Defendants admit in their Answer, "an individual need not be physically present during a riot to be covered by The Act." (Dkt. # 16 at ¶ 23). The same is true for SDCL § 22-10-6.1. (*Id.* at ¶ 38). Because liability extends to speakers who are not present at the riot, these laws necessarily reach beyond speech that is uttered at or during the riot, meaning the Laws unconstitutionally proscribe speech without any consideration of whether action is imminent.

Moreover, accepting Defendants' argument would mean that any speech uttered before a riot begins—including speech that intentionally calls for and has the immediate and likely effect of causing a riot, that is, speech the state *can* prohibit—would not be prohibited under the Challenged Laws. In addition to being illogical, such an interpretation would be fatally underinclusive if, as Defendants claim, the State's goal is to "protect members of the public and public property from violent and unlawful conduct." (Dkt. #28 at 35). Such underinclusiveness "is alone enough to defeat [a law]," *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 802 (2011), because "it raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2376 (2018) (quoting *Ent. Merchants*, 564 U.S. at 802); *see also SD Voice v. Noem*, No. 1:19-CV-010030-CBK at *9-10 (D.S.D. May 9, 2019) ("IM 24's ban is underinclusive, which diminishes the credibility of the State's rationale for restricting speech in the first place.").[4]

---

[4] Because this opinion is not yet available on Westlaw or Lexis, Plaintiffs have attached a true and correct copy as Exhibit 1 of this motion.

### D.     The Challenged Laws Do Not Require Likely Causation of Lawlessness.

The Challenged Laws also fall short of *Brandenburg*'s requirement that the proscribed speech be *likely* to result in imminent lawless action. Once again, the plain language of the Laws does not require that any resulting lawless action be likely. Despite this shortcoming, Defendants argue that the same "prerequisite" condition they rely upon for imminence—"that the person at whom the speech is directed be a participant in an ongoing riot"—also fulfills *Brandenburg*'s likelihood requirement because a person who is already participating in a riot is more likely to use force or violence. (Dkt. #28 at 26-27).

As discussed above, this misreads the Challenged Laws, which do not require that the speech be intentionally directed toward a riot participant, or that it be uttered during a riot. As with the imminence requirement, Defendants' argument conflates the two moments in time and the two relevant persons. There is nothing in the statutes that requires that the lawless action be likely when the person subject to the Laws—the speaker—speaks.

Even if the Challenged Laws were limited only to speech occurring during an ongoing riot, as Defendants suggest, Defendants' argument would essentially deprive any speech uttered during a riot—which, under South Dakota law, encompasses any situation in which three people have together threatened to engage in violence, but have not yet done so, *see* SDCL § 22-10-1— of protection. This itself is unconstitutional. "Banning or postponing legitimate expressive activity because other First Amendment activity regarding the same subject has resulted in violence deprives citizens of their right to demonstrate in a timely and effective fashion." *Collins v. Jordan*, 110 F.3d 1363, 1373 (9th Cir. 1996). Defendants' reading of the Laws could chill someone not only from protesting, but even from uttering the words "Help me" during a riot out of concern that those words would "encourage" someone present to an act of force or violence.

15

This is improper. "The courts have held that the proper response to potential and actual violence is for the government to ensure an adequate police presence, *see, e.g.*, *Cox v. Louisiana*, 379 U.S. 536 (1965), and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure." *Id*.

In addition, Defendants' argument that the Challenged Laws include a likelihood requirement "because the tools to fulfill the directive are immediately available" to anyone participating in a riot proves too much. (Dkt. #28 at 26). Individuals always have such "tools . . . immediately available"; all they need is their bodies. Indeed, in *Sineneng-Smith*, 910 F.3d 461, the Ninth Circuit struck down a federal statute that criminalized "encourag[ing] or induc[ing] an alien to come to, enter, or reside in the United States" after holding that the statute does not "require that any encouragement or inducement make it 'likely' that an alien will violate the immigration law." There, as here, the listener would have all of the "tools . . . available" to act in accordance with such encouragement. Therefore, merely having the tools available to act on encouraging speech cannot be enough to satisfy *Brandenburg*'s likelihood requirement.

Alternatively, Defendants claim that the Challenged Laws meet the likelihood requirement because "the terms 'directs, advises, encourages, or solicits' must be construed as *causing* another 'to use force or violence in furtherance of the crime of riot,'" and so the Laws apply only if violence actually occurs. (Dkt. # 28 at 13 (emphasis in original)).[5] Defendants are

---

[5] Defendants agree that, for civil liability to attach to speech, the speech must actually result in unlawful activity. Defendants argue that the one civil law at issue, the Act, satisfies this requirement because "a person is liable if already engaged in a riot—which is defined to include force or violence and must be found to have occurred in order for civil liability to be imposed—and was directed by a riot booster to commit [sic] forceful or violent act." (Dkt. # 28 at 27). This argument appears to focus on Section (2)(3) of the Act and the state's ability to impose civil liability on a rioter who causes damages through force or violence, rather than a speaker who uttered encouraging words. Plaintiffs do not challenge that provision of the Act, and Defendants do not offer an argument to cure the defect presented by Sections 2(1) and 2(2) of the Act.

once again pretending that these Laws contain words that are not there. The statute challenged in *Brandenburg* prohibited "advocat[ing] or teach[ing] the duty . . . of violence"—language almost mirrored by the Laws' regulation of "enourag[ing]" or "advising" others to an act of force or violence—and the Supreme Court held that that language failed its three-prong test, including likelihood. 395 U.S. at 448. Similarly, in *Sineneng-Smith*, the Ninth Circuit held that the law at issue unconstitutionally criminalized speaking words of encouragement without requiring that anyone "actually commit the underlying offense," thereby distinguishing between words that encourage and those that actually cause violations of the law. 910 F.3d at 482. Here, too, the Challenged Laws are impermissibly aimed at the speaker who utters encouragement, not the listener who participates in the riot. Therefore, the Challenged Laws "proscribe advocacy of the use of force" regardless of whether the listener ultimately engages in such force, and such a restriction on speech violates the First Amendment. *Brandenburg*, 395 U.S. at 447.

### E.    Accepting Defendants' Argument Would Require Improperly Rewriting the Statute.

"[I]n interpreting a statute a court should always turn to one cardinal canon before all others . . . courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). A court does not have the authority to "rewrite a . . . law to conform it to constitutional requirements." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 884–85 (1997) (internal quotations omitted). To interpret a law differently than its plain text provides "would constitute a serious invasion of the legislative domain and sharply diminish [the legislature's] incentive to

---

Moreover, Defendants' persistent argument that "each participant in the conduct regulated under this statute must already be engaged in a riot . . . to be found guilty," (Dkt. # 28 at 13), suggests that, rather than punish riotous action, the only thing the Laws punish is speech.

draft narrowly tailored law in the first place." *United States v. Stevens*, 559 U.S. 460 (2010) (internal citations and quotations omitted). A limiting construction is proper only if a statute is "readily susceptible to such a construction." *Reno*, 521 U.S. at 884 (internal marks omitted).

The Challenged Laws are not readily susceptible to a construction other than the one required by their plain text. Nowhere in the text of these Laws is there a requirement of intent, or of imminent action, or of likelihood. Defendants have not offered legislative "text or other source of congressional intent [that] identifie[s] a clear line that this Court could draw," and so drawing "lines between categories of speech covered by [these] overly broad statute[s]" would undermine the duty of the legislature to craft precise legislation. *Id.*

Moreover, to do so in this case would ignore the Supreme Court's repeated caution that any category of speech that is not protected by the First Amendment, including incitement, must be "well-defined" and "narrowly limited." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942); *accord Stevens*, 559 U.S. at 468–69. Therefore, this Court should reject Defendants' argument that these are properly crafted incitement laws, and instead find that the Challenged Laws fail strict scrutiny.

**III.     The Challenged Laws Are Overbroad and Void for Vagueness.**

Because the Challenged Laws proscribe such a wide array of protected speech, they are also fatally overbroad and vague.  Indeed, Defendants recognize that these Laws cannot withstand scrutiny unless words that do not appear in the text are presumed to exist anyway. Given that this Court cannot rewrite these Laws but must instead construe them according to their plain text, the Court must conclude that, as written, these laws are fatally overbroad and vague.

Defendants argue that Plaintiffs' challenge should be disfavored because it is facial, and contend that Plaintiffs can succeed only if they can "establish 'that no set of circumstances exists under which the [laws] would be valid.'" (Dkt. # 28 at 21 (quoting *Phelps-Roper v. City of Manchester*, 697 F.3d 678, 685 (8th Cir. 2012)). In their next sentence, however, Defendants recognize that, while this is the typical rule for facial challenges, "[i]n the First Amendment context . . . a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010). "Th[is] doctrine is predicated on the sensitive nature of protected expression: 'persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions by a statute susceptible of application to protected expression.'" *New York v. Ferber*, 458 U.S. 747, 768 (1982) (quoting *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 634 (1980)). As discussed at length in Plaintiffs' motion for preliminary injunction, and not rebutted by Defendants, that is precisely the danger presented by these Laws. (*See* Dkt. # 9 at 19–26). In addition, the problem of vagueness is "particularly treacherous where, as here, the violation of its terms carries criminal penalties and fear of incurring these sanctions may deter those who seek to exercise protected First Amendment rights." *SD Voice*, at \*10–11 (quoting *Buckley*, 424 U.S. at 16).

Every argument Defendants make, including all of their arguments in opposition to Plaintiffs' motion for preliminary injunctive relief, ask the Court to interpret these laws as if they were written differently. (*See* Dkt. #28 at 29 (arguing the Laws do not interfere with the right of association because they do not reach protected speech), *id.* at 29-30 (same for overbreadth), *id.* at 30-32 (same for vagueness), at 32-33 (same for no threat of irreparable harm to Plaintiffs), *id.* at 33-34 (same for the balance of harm to the Plaintiffs as compared to the State if an injunction

was granted), *id.* at 34-35 (same for the public interest implicated by the granting of an injunction)). This Court, however, must read the Laws the way they are written. As written, these laws are overbroad and vague in violation of the First Amendment.

**IV.  Even Accepting Defendants' Reading of the Challenged Laws Would Not Cure All of the Act's Defects.**

**A.  The Riot Boosting Act's Prohibition on Soliciting or Compensating Others to Be Arrested Is Overbroad.**

Section 4 of the Riot Boosting Act is overbroad because it impermissibly proscribes protected speech by imposing penalties on persons who solicit or compensate others "to commit an unlawful act or *to be arrested*." (Dkt. #9 at 24-26). While the government may prohibit solicitation of unlawful acts, getting arrested is not an unlawful act, and individuals who get arrested have not necessarily broken the law. *See Davis v. United States*, 229 F.3d 181, 185 (8th Cir. 1956). The government cannot prohibit all such solicitation and compensation, much of which constitutes protected expression and association. *See NAACP v. Button*, 371 U.S. at 429 ("solicitation is [not] wholly outside the area of freedoms protected by the First Amendment" (internal marks omitted)); *Claiborne*, 458 U.S. at 931 n.78 (holding that an organization could not be held liable for assisting members with legal costs, including posting bond for those arrested for boycotting). Accordingly, Section 4 is fatally overbroad because it is not limited to solicitation of or compensation for unlawful activity.

Defendants ask this Court to ignore this separate constitutional infirmity based on the unfounded argument that, according to Defendants, the Act regulates only incitement. (Dkt. #28 at 29–30). Defendants have offered no arguments to suggest that Section 4 is a valid exercise of the state's powers, and do not contest Plaintiffs' argument that its prohibition on "soliciting or compensating another . . . to be arrested" is overbroad. Instead, Defendants seek to deflect the

Court's scrutiny of Section 4 by claiming that Section 4 must be read in conjunction with "liability for the damages under the Act for the conduct specified in Section 2." (Dkt. # 28 at 18). This reading contradicts Section 4's plain words, which imposes damages not for undertaking the acts prohibited in Section 2, but rather for the separate activity of "solicit[ing] or compensat[ing] any other person . . . to be arrested." Indeed, this unconstitutionally overbroad application of Section 4 appears to have been affirmatively intended by the Defendants. (See Dkt. #9 ¶28 (noting that Defendant Noem has cited George Soros as an example of a "national offender" who funds protests that the act is "hoping to shut down"). Therefore, contrary to Defendants' assertions, Sections 2 and 4 create liability for wholly separate acts, and nothing in Section 2— even if it were itself constitutional, which it is not—can save Section 4 from separate constitutional scrutiny.

Moreover, even if Defendants were correct that Section 4 can only impose liability on individuals who have already violated Section 2 and that Section 2 can reach only incitement, those arguments would not address the fact that Section 4 imposes liability—treble damages—on the basis of protected speech. This itself would violate the First Amendment. The Supreme Court has held that "evidence of a defendant's abstract beliefs . . . when those beliefs have no bearing on the issue being tried" cannot be used to determine a penalty. *Dawson v. Delaware*, 503 U.S. 159, 168 (1992); *see also Wisconsin v. Mitchell*, 508 U.S. 476, 485–86 (1993). Here, Defendants do not argue that soliciting another person "to be arrested" has any bearing on whether or not a person engaged in "riot boosting." Thus, Section 4 of the Act is fatally overbroad because it imposes liability for acts that the state cannot validly punish.

### B.   The Act Violates the First Amendment Right of Association.

Additionally, Defendants fail to address the Act's violation of the right of association. Because the Act's definition of a "person" who can be liable includes "any association, . . . nonprofit, other entity, or any group acting as a unit," it imposes liability on organizations. And it does so without requiring, as Supreme Court precedent demands, that the proscribed act be "undertaken within the scope of [the organization's] actual or apparent authority," or that "the organization 'had knowledge and specifically ratified' the unlawful acts." (*See* Dkt. # 9 at 26–27 (quoting *Claiborne Hardware*, 458 U.S. at 931 n.78)). "'The First Amendment protects political association as well as political expression' because 'effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association.'" *SD Voice*, at *4 (quoting *Buckley v. Valeo*, 424 U.S. at 15).

Here, if Plaintiff Sierra Club were to urge its members to oppose construction of the pipeline, but did not know about or ratify any acts of violence, Sierra Club would nevertheless be liable for damages if a jury were to determine that those statements encouraged others to engage in violence. Even if Defendants were correct that the speech proscribed by the Act is only incitement, the Act would nevertheless fail to satisfy the standard required to impose liability on an organization.

Thus, for the reasons stated above, Defendants' motion for judgment on the pleadings should be denied, and Plaintiffs' motion for a preliminary injunction should be granted.

### V.   Defendants' Motion for Certification Should Be Denied.

In the alternative, Defendants "move[] this Court to certify the following question to the South Dakota Supreme Court: 'Are Senate Bill 189, SDCL §§ 22-10-6 and 22-10-6.1 limited to proscribing advocacy of the use of force or violence where such advocacy is directed to inciting

22

or producing imminent lawless action that is likely to incite or produce such action?'" (Dkt. 29, at 7). Essentially, the State Defendants seek *Pullman* abstention in an effort to save their wildly overbroad and vague statutes from federal judicial scrutiny by having the South Dakota Supreme Court drastically limit them.

Defendants' request should be denied for three reasons. Abstention and certification are appropriate only when (A) the proposed construction of the challenged statute would resolve all constitutional questions in the pending federal litigation, *McAllister-Lewis v. Goodyear*, No. CIV 14-4103, 2017 WL 3207730, at *5 (D.S.D. July 27, 2017); SDCL § 15-24A-1[6]; (B) the statute is "readily susceptible" to a limiting construction, *Reno*, 521 U.S. at 884; and (C) when there is a "[n]ovel, unsettled questions of state law," *Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 (1997).[7] None of these prerequisites exists here and Plaintiffs would be severely prejudiced by the delay caused by certification.

---

[6] Defendants articulate the state certification standard laid out in SDCL 15-24A-1 (Dkt. #27 at 4) ("The [South Dakota] Supreme Court may answer questions of law certified to it by . . . a United States district court, if there are questions of law of this state involved in any proceeding before the certifying court *which may be determinative of the cause pending in the certifying court* and it appears to the certifying court and to the Supreme Court that there is no controlling precedent in the decision of the Supreme Court of this state.") (Emphasis added).

[7] The Defendants cite *Railroad Comm'n of Tex. v. Pullman Co*., 312 U.S. 496 (1941) (*Pullman*) to make the point that certification is more straightforward than *Pullman* abstention (Dkt. #29 at 5), but then cite district court opinions citing *Pullman* factors without including all of the factors articulated by the Eighth Circuit. In the Eighth Circuit, *Pullman* abstention also "requires consideration of (1) the effect abstention would have on the rights to be protected by considering the nature of both the right and necessary remedy; (2) available state remedies; (3) whether the challenged state law is unclear; (4) whether the challenged state law is fairly susceptible to an interpretation that would avoid any federal constitutional question; and (5) whether abstention will avoid unnecessary federal interference in state operations." *Beavers v. Arkansas State Bd. of Dental Examiners*, 151 F.3d 838, 841 (8th Cir. 1998) citing *George v. Parratt*, 602 F.2d 818, 820-22 (8th Cir.1979). The first factor was described in *Parratt* as: "what effect will abstention have on the rights to be protected?" because "federal courts have held abstention is particularly inappropriate with actions brought to protect fundamental rights, [*i.e.*], *if delay or postponement by the federal courts will have a chilling effect on the exercise of first amendment rights*." This

The situation here is virtually identical to the situation at issue in *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452 (8th Cir. 1997). There, as here, the plaintiffs challenged a South Dakota law because, among other reasons, it failed to require scienter as a condition of liability. Chief Judge Battey denied the state's request to certify, and the Eighth Circuit affirmed in language directly applicable to the case at bar:

> The State appeals these holdings, asking us to certify the interpretation of these provisions to the South Dakota Supreme Court. We find no need to do so. Certification to a state court is appropriate when the state court's construction of an uncertain state law could make resolution of federal constitutional questions unnecessary. *See Clay v. Sun Ins. Office, Ltd.*, 363 U.S. 207, 211–12, 80 S.Ct. 1222, 1225-26, 4 L.Ed.2d 1170 (1960). Certification is not necessary, though, where the statute is "neither ambiguous nor obviously susceptible of a limiting construction." *Houston v. Hill*, 482 U.S. 451, 471, 107 S.Ct. 2502, 2514, 96 L.Ed.2d 398 (1987). *See also Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 237, 104 S.Ct. 2321, 2327-28, 81 L.Ed.2d 186 (1984) (no need to abstain when Act unambiguous and no other provision of state law suggests that Act "does not mean exactly what it says"); *Colorado River Water Const. Dist. v. United States*, 424 U.S. 800, 815 n. 21, 96 S.Ct. 1236, 1245 n. 21, 47 L.Ed.2d 483 (1976) ("[T]he opportunity to avoid decision of a constitutional question does not alone justify abstention by a federal court.").

*Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1463 (8th Cir. 1995).

Here, too, as explained above, the Challenged Laws are unambiguous and nothing suggests they do not mean exactly what they say. They are plainly unconstitutional on their face and there is no reason for the parties to expend the time and effort to contest the validity of those laws elsewhere. The Supreme Court has explained that federal courts may "avail themselves of state certification procedures" when "[n]ovel, unsettled questions of state law" are presented, *Arizonans*, 520 U.S. at 79, but no such unsettled question of state law is presented here, as

---

Pullman abstention factor is not discussed or identified in the Defendants' brief and it weighs heavily in favor of denying the Defendants' motion.

discussed *infra*.[8] Rather, the state courts have provided relevant guidance. Indeed, Defendants cite ample state case law explaining the Challenged Laws and how the state court will interpret them. (Dkt. #29 at 2, 7).

Second, resolution of the certified question would not resolve all of Plaintiffs' claims; indeed, Defendants admit that certification may only *narrow* the issues. (Dkt. #29 at 7). Moreover, while abstention is within the discretion of this Court, it should *not* be exercised where Plaintiffs seek injunctive relief to preserve fundamental rights. Abstention from the exercise of federal jurisdiction is the exception, not the rule. "Federal courts, it was early and famously said, have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) citing *Cohens v. Virginia*, 6 Wheat. 264, 404 (1821). "Jurisdiction existing, this Court has cautioned, a federal court's 'obligation' to hear and decide a case is 'virtually unflagging.'" *Id.* citing *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Certification, and the delay associated with it, will do nothing to stop Plaintiffs' ongoing,

---

[8] Defendants cite *Stanko v. Oglala Sioux Tribe*, 916 F.3d 684, 700 (8th Cir. 2019), to argue abstention is proper in this case (Dkt. #29 at 5), but their reliance is misplaced. Indeed, Defendants are comparing apples to oranges. Although *Stanko* addressed an issue of abstention, resolution of the case turned on a factor not present here: the duty of federal courts to require tribal court *exhaustion*. In *National Farmers Union Ins. Co. v. Crow Tribe of Indians*, 471 U.S. 845 (1985), the Court held that a party being sued in tribal court that wants to challenge the tribal court's jurisdiction normally must first litigate those claims in tribal court. In *Stanko*, the Eighth Circuit applied that exhaustion requirement to the case at hand. *See Stanko*, 916 at 700 (affirming dismissal of federal complaint and directing the plaintiff "to exhaust tribal court remedies in this case.") No similar concerns arise in the case at bar. Moreover, as Defendants acknowledge, *Stanko* clarifies that *Pullman* is applicable to "difficult" questions of state law (Dkt. #29 at 5); here, there is no "difficult" question of state law. Similarly, they use *Arizonans*, 520 U.S. 43 at 76 and *Lehman Brothers v. Schein*, 416 U.S. 386, 391 to argue the undisputed proposition that, in cases where there is no controlling interpretation from the state court, certification saves "time, energy, and resources." (Dkt. #29 at 6). However, energy and resources are not saved when a federal court already has a "controlling interpretation of [a] statute's meaning" as is the case here. *Arizonans*, 520 U.S. at 46.

irreparable harm and will instead deprive the federal court of its jurisdiction and exacerbate the chilling effect of the Laws.

Lastly, the Laws are not susceptible to a limiting construction. Based on the plain language of the Challenged Laws, as described at length above, the state would have to construe them in a way that disregards the plain meaning of the words and such rewriting would constitute a "serious invasion of the legislative domain and sharply diminish [the legislature's] incentive to draft narrowly tailored law in the first place." *United States v. Stevens*, 559 U.S. 460 (2010). When extensive "plastic surgery," *Shuttlesworth v. Birmingham*, 394 U.S. 147, 153 (1969), is necessary to address even a portion of the constitutional defects in a challenged law and the state court's limiting instruction will not resolve all of the constitutional defects, certification is inappropriate. *See also City of Houston v. Hill*, 482 U.S. 451, 469 (1987).

## A.    Certification Will Not Resolve Plaintiffs' Claims.

Defendants' motion for certification is inappropriate because Defendants' proposed question to the South Dakota Supreme Court would not be determinative of the outcome of this case. While this Court has discretion to certify, that discretion should only be exercised when a question of South Dakota law "may be determinative of the cause pending" in the federal court. *See McAllister-Lewis v. Goodyear*, No. CIV 14-4103, 2017 WL 3207730, at *5 (D.S.D. July 27, 2017) ("The issue [to be resolved by the question] must be determinative to be certified to the South Dakota Supreme Court.").

Defendants claim that if the South Dakota Supreme Court were to interpret the Challenged Laws in the manner Defendants hope it would, such an interpretation would "narrow the issues" in this case.  Notably, Defendants do not—and cannot—contend that the state

Supreme Court's interpretation will resolve the *entire* case. (Dkt. #29 at 7).[9] Specifically, this Court would still need to determine (1) whether Section 4 is constitutionally overbroad, and (2) whether the Act unconstitutionally imposes civil liability on organizations, on the grounds set forth above.

This alone justifies denial of the State Defendants' motion. Because the answer to the question the Defendants seek to certify would not resolve all of Plaintiffs' claims, the motion for certification must denied. *See McAllister-Lewis v. Goodyear*, at *5 (D.S.D. July 27, 2017) (Piersol) ("The issue [to be resolved by the question] *must be determinative* to be certified to the South Dakota Supreme Court.") (emphasis added).

### B.   There Is No State Law Uncertainty or Novelty.

The Court's discretion to certify should only be exercised when there is no controlling precedent in the South Dakota Supreme Court's decisions, thus the federal court is presented with a "novel, unsettled question of state law." *Arizonans*, 520 U.S. at 79 ("Novel, unsettled questions of state law, . . . *are necessary* before federal courts may avail themselves of state certification procedures") (Emphasis Added). No such unsettled question of state law exists here. Defendants take pains to point out that the South Dakota Supreme Court has already reviewed elements of the Challenged Laws. The Defendants cite *Bad Heart Bull* and *Means*, South Dakota Supreme Court decisions, to argue that the Challenged Laws, read in conjunction with the laws reviewed in those cases, are constitutional. (Dkt. #29 at 2, 7). Therefore, the Defendants are not arguing

---

[9] Defendants argue that it "may" "resolve the matter entirely" (Dkt. #29 at 7), but there is no affirmative statement in their brief that it will resolve the matter entirely, nor is there any reason to believe it would, given that the certified question, as explained *infra*, does not seek to resolve all of Plaintiffs' constitutional claims.

that there is no controlling precedent. To the contrary, they argue that *Bad Heart Bull* and *Means* are controlling.[10]

Moreover, Defendants are not affirmatively arguing that the Laws are ambiguous or unclear. Rather, they argue that the Challenged Laws are plainly constitutional incitement statutes on their face—but that, if this Court "has questions" about their interpretation or, in essence, disagrees, the State Supreme Court can "narrow the issues" or "resolve the matter entirely" *by determining "that the challenged statutes fall within the permissible regulations as [described] in Brandenburg and Williams.*" (Dkt. #29 at 7) (Emphasis Added). The crux of their argument is that if this Court does not agree with their interpretation of the Challenged Laws as "constitutional regulation," then their question should be certified. (*Id*. at 6 ("If the Court *has questions*, however, Certification, would allow this Court to 'save time, energy, and resources and hel[p] build a cooperative judicial federalism.'")). Defendants seek only to substitute the judgment of the state courts for the judgment of this federal court on a *federal claim* and such a substitution is improper. This is not grounds for certification. Rather, it is an attempt to seek a different court's review of whether the Challenged Laws are constitutional, not clarification from the state court regarding the meaning of these laws.

Defendants point out that "there is no guidance on the [Riot Boosting] Act from South Dakota's highest court." (*Id*. at 6). However, "the fact that a state court has not ruled on the precise issue at stake in [a] case does not mean that the proper resolution of the state law issue is 'uncertain.'" *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 940 (9th Cir. 2002)

---

[10] The State Defendants argue that its "riot statutes have been part of the penal code since 1877;" the Riot Boosting Act was passed in reliance "on these statutes;" (Dkt. #29 at 2) and that "these statutes, when read in conjunction with each other, present constitutional regulation." (*Id*. at 6).

(citing *Wisconsin v. Constantineau*, 400 U.S. 433, 439 (1971). Here, the Defendants have articulated how the state's highest court will decide this issue making certification improper.[11]

### C.     The Challenged Laws Are Not Susceptible to a Constitutional Interpretation.

The only way to make the Challenged Laws constitutional would be to completely rewrite them, with large parts stricken. As discussed at length above, *supra*, § II(E), Defendants seek to have the Challenged Laws interpreted in such a way that the legislature's plain, unambiguous words are nullified. A court does not have the authority to "rewrite a . . . law to conform it to constitutional requirements." *Reno,* 521 U.S. at 884-85 (internal quotations omitted). Neither the state nor the federal court has the authority to "interpret a law differently than its plain text provides" because to do so "would constitute a serious invasion of the legislative domain and sharply diminish [the legislature's] incentive to draft narrowly tailored law in the first place." *United States v. Stevens*, 559 U.S. 460, 481 (2010) (internal citations and quotations omitted). As described above, there is no way to interpret the Laws in a way that makes them "well-defined" and "narrowly limited" in terms of their prohibition on speech. Therefore, the Laws are unconstitutional, *see Brandenburg*, 395 U.S. at 449, *Chaplinsky*, 315 U.S. at 571–72 (1942), *Stevens*, 559 U.S. at 468–69, and there is no reason to certify Defendants' question to the state supreme court.

---

[11] The Defendants cite *Cty. of Ramsey v. MERSCORP Holdings, Inc.*, 776 F.3d 947, 951 (8th Cir. 2014) for the proposition that "the Eighth Circuit has held that a federal court should determine those issues presented to it, '[a]bsent a close question of state law or a lack of state guidance[.]'" *Id*. The proposition is accurate, but in the same case the Eighth Circuit observed that the question was "not a close question of state law where state-court guidance is lacking." *Id*. To the contrary, in *Ramsey* as is the case here, the state "courts interpret[ed] th[e] statute" and their "case law establishe[d]" the meaning of the statute being reviewed. *Id*. at 950. Therefore, *Ramsey* does not support the Defendants' argument that this court ought to certify a question to the state Supreme Court where the South Dakota Supreme Court has already addressed the elements necessary to interpret the Laws.

**D.      Plaintiffs Will Be Severely Prejudiced by Certification.**

Lastly, Defendants' motion for certification should be denied because Plaintiffs will be severely prejudiced by the delay. Federal courts "should not halt proceedings in a case involving facial First Amendment claims raised under the federal constitution for the purpose of allowing state courts to weigh in because such a delay would itself chill freedom of speech." *Zwickler v. Koota*, 389 U.S. 241, 252 (1967); *City of Houston v. Hill*, 482 U.S. 451, 467 (1987) (citing *Dombrowski v. Pfister*, 380 U.S. 479, 489-90 (1965)). Plaintiffs seek a preliminary injunction from this Court to protect their First Amendment right to organize and protest the Keystone Pipeline. Without an injunction, the Plaintiffs' injuries will persist. Courts around the country have recognized that abstention itself is a delay "that might significantly impair constitutional rights[.]" *See, e.g.*, *Nissan Motor Corp. in U.S.A. v. Harding*, 739 F.2d 1005, 1011 (5th Cir. 1984); *Anderson v. Babb*, 632 F.2d 300 (4th Cir. 1980); *see also SD Voice v. Noem*, No. 1:19-CV-010030-CBK at *14-15 (noting the danger posed by regulations which interfere with the "rights to engage in political speech and to associate with others to do so[]"). Indeed, while Defendants' proposed question would not adequately clarify the scope of the Challenged Laws to determine this case, even assuming *arguendo* that the certified question would narrow the issues, the Supreme Court has acknowledged that "harms such as delay can outweigh the need for clarification and dictate that abstention be avoided." *Lister v. Lucey*, 575 F.2d 1325, 1333 (7th Cir. 1978) (citing *Mayor v. Educational Equality League*, 415 U.S. 605, 628 (1974)); *Bellotti v. Baird*, 428 U.S. 132, 150 (1976).

Finally, Defendants argue that language in *Harrison v. NAACP*, 360 U.S 167 (1959), supports their motion for certification (and the resulting delay) because the "state court should be given reasonable opportunity to interpret and limit state enactments," but *Harrison* is

30

distinguishable. First, in *Harrison*, there was a "possibility of [a] limiting interpretation, characteristic of constitutional adjudication." *Id*. at 177. As discussed above, no such limiting interpretation is reasonably possible here. Second, the harm to those seeking to invalidate the laws was minimized by the state's "assurances," which the Court understood to mean that the state would "never [] proceed against appellees under any of these enactments with respect to activities engaged in during the full pendency of this litigation." *Id*. at 179. In this case, Defendants have provided no such assurances, nor is there any assurance they could offer short of enjoining enforcement of and striking the Laws which would allow the free exercise of Plaintiffs' speech rights and remove their chilling effect. "[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *Stevens*, 559 U.S. at 480. Therefore, the ongoing and exacerbated harm to Plaintiffs' fundamental rights should this case be certified to the state court also justifies denial of the Defendants' motion.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Preliminary Injunction should be granted and Defendants' Motion for Judgment on the Pleadings or, In the Alternative, for Certification to the State Supreme Court should be denied.

## ORAL ARGUMENT REQUESTED

Pursuant to D.S.D. Civ. LR 7.1(C), Plaintiffs respectfully request oral argument on this motion.

Dated this 21st day of May, 2019

/s/ Brendan V. Johnson

Brendan V. Johnson (SD Bar # 3263)
Erica A. Ramsey (SD Bar # 4901)
Timothy W. Billion (SD Bar # 4641)

ROBINS KAPLAN LLP
140 North Phillips Ave, Suite 307
Sioux Falls, SD 57104
Tel: 605-335-1300
BJohnson@RobinsKaplan.com
ERamsey@RobinsKaplan.com
TBillion@RobinsKaplan.com

Courtney Bowie*
American Civil Liberties Union of South
Dakota
P.O. Box 1170
Sioux Falls, SD 57101
Tel.: 201-284-9500
e-mail: cbowie@aclu.org

Vera Eidelman*
American Civil Liberties Union Foundation
Speech, Privacy, and Technology Project
125 Broad St.
New York, NY 10004
Tel.: 212-549-2500
E-mail: veidelman@aclu.org

Stephen Pevar (SD Bar # 1364)
American Civil Liberties Union Foundation
765 Asylum Avenue
Hartford, CT 06105
Tel.: 860-570-9830
Fax: 860-570-9840
E-mail: spevar@aclu.org
*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I, Brendan V. Johnson, hereby certify that the foregoing memorandum complies with the limits in D.S.D. Civ. LR 7.1(B)(1). I further certify that, in preparation of this memorandum, I used Microsoft Word 2016 and this word processing program has been applied specifically to include all text – including headings, footnotes, and quotations – except the caption, signature block, and this certification. I further certify that this document contains 10,285 words.

/s/ Brendan V. Johnson_____