UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| DAKOTA RURAL ACTION; | \* | CIV 19-5026 |
| DALLAS GOLDTOOTH; | \* | |
| INDIGENOUS ENVIRONMENTAL | \* | |
| NETWORK; NDN COLLECTIVE; | \* | |
| SIERRA CLUB; and NICHOLAS TILSEN; | \* | |
| | \* | |
| Plaintiffs, | \* | |
| vs. | \* | ORDER |
| | \* | |
| KRISTI NOEM, in her official capacity as | \* | |
| Governor of the State of South Dakota; | \* | |
| JASON RAVNSBORG, in his official | \* | |
| capacity as Attorney General; and | \* | |
| KEVIN THOM, in his official capacity as | \* | |
| Sheriff of Pennington County, | \* | |
| | \* | |
| Defendants. | \* | |
| | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiffs have brought suit challenging the constitutionality under the Constitution of the United States of a riot boosting statute passed in 2019 by the South Dakota Legislature, Senate Bill 189, and two felony riot statutes, SDCL § 22-10-6 and § 22-10-6.1. Plaintiffs request injunctive and declaratory relief.

## BACKGROUND

The riot boosting statute was introduced and passed in the final week of the 2019 legislative session with an emergency clause to make it immediately effective. The publicly made claims by the Governor and others were that the legislation was to address costs of various persons and entities from anticipated rioting as a result of the building of the Keystone XL pipeline through South Dakota. The pipeline is to carry petroleum product from Canada though Montana, North Dakota, and South Dakota to connect with another pipeline in Nebraska which will take product to shipment though the Gulf of Mexico. Extensive protests did occur during Keystone pipeline construction in

North Dakota. The project was stayed by a federal court order in Montana, *Indigenous Environmental Network v. U.S. Dept. of State*, 369 F.Supp.3d 1045 (D. Mont. 2018); *see also* 317 F.Supp.3d 1118 (2018), 347 F.Supp.3d 561 (2018) (same case). The appeal from that decision was dismissed as moot on June 6, 2019 by the Ninth Circuit Court of Appeals as President Trump had issued a new permit for the construction on March 29, 2019. The new permit is now the subject of litigation requesting an enjoining of the project. A motion to consolidate the two cases is pending in *Indigenous Environmental Network v. Trump, et al.*, Civ 4:19-cv-000028 (D.Mont. 2019).

At the hearing on June 12, 2019, the parties represented that construction is not now under way in South Dakota as the owner has reported that it is too late in the construction season to commence work in South Dakota this year. Pre-construction activities are, however, apparently in progress. Sioux Falls Argus Leader, July 1, 2019, page 2A. Plaintiffs and others claim by affidavit that they do in various ways intend to protest and otherwise provide and seek and provide support, financial and otherwise, for resistance, including protests, to the building of the pipeline in South Dakota. As a result of the threat presented by the riot boosting and criminal riot statutes, the Plaintiffs and others claim these laws have a chilling effect on their free speech and association rights and they are prevented from soliciting support or contributing or otherwise supporting peaceful protest of the construction of the project as they are afraid of criminal prosecution as well as substantial and unwarranted damage awards against them.

## STANDING TO SUE

Standing issues were not raised by the parties except as to the claims against Kevin Thom in his official capacity as Sheriff of Pennington County. By separate Order, that claim is dismissed for lack of standing. The Court will address that issue as to the remaining parties as it can be raised at any time.

Governor Noem and Attorney General Ravnsborg do not contest Plaintiffs' standing in this case. The Court will address, however, why standing is appropriate against those defendants because Article III standing to bring a First Amendment free speech challenge is "an inescapable threshold

question," *Advantage Media, L.L.C. v. Eden Prairie*, 456 F.3d 793, 799 (8th Cir. 2006), and it "requires a showing that each defendant caused [the plaintiff's] injury and that an order of the court against each defendant could redress the injury." *Calzone v. Hawley,* 866 F.3d 866, 869 (8th Cir. 2017); *see Lujan v. Defenders of Wildlife*, 504 U.S. 556, 560 (1992) (a plaintiff must establish "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.").

In the Order granting Defendant Kevin Thom's Motion to Dismiss, the Court determined that Plaintiffs have alleged an injury in fact that meets the first requirement of standing. For the following reasons, Plaintiffs also meet the causation and redressability requirements as to Governor Noem and Attorney General Ravnsborg.

"[W]hen a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision." *Calzone*, 866 F.3d at 869 (citing *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 957–58 (8th Cir. 2015)). Whether a defendant possesses enforcement authority sufficient for standing purposes turns on whether he or she has "some connection with the enforcement of [the] state law." *Dig. Recognition Network*, 803 F.3d at 957 (citation and quotation marks omitted).

In *Citizens for Equal Protection v. Bruning*, 455 F.3d 859 (8th Cir. 2006), the plaintiffs challenged a state constitutional amendment stating that only marriage "between a man and a woman" was valid. The Eighth Circuit concluded that the Nebraska Attorney General's and Governor's broad power to enforce Nebraska's constitution and statutes was a sufficient basis to satisfy causation and redressability elements of standing. *Id.* at 864. The Eighth Circuit concluded that injunctive relief restraining the Attorney General and the Governor from enforcing the statute would redress at least part of the Plaintiffs' alleged injury. *See id.* Thus the "case or controversy requirement of Article III" was satisfied. *Id.*

3

Similarly, the Court concludes in this case that the general enforcement powers of the South Dakota Attorney General and Governor[1] meet the causation and redressability requirements, and Plaintiffs have standing to assert their claims for injunctive relief against Governor Noem and Attorney General Ravnsborg.

## DISCUSSION

The 2019 riot boosting statutes are additions to Chapter 20-9 of South Dakota Codified Laws. Chapter 20-9 is entitled "Liability for Torts." Senate Bill 189 is now codified as SDCL § 20-9-53 through SDCL § 20-9-57. These civil law additions borrow heavily from the felony riot statutes in Chapter 22-10, entitled "Riot and Unlawful Assembly."

For purposes of this analysis, protected speech can be speech and other expressive activity including money or other material contributions as well as statements of support by speech or written word including ads, e-mail, texts and personal participation in protest. A person's support of a cause can be protected speech and also protected by the right of assembly in the First Amendment.

There are criminal statutes in South Dakota defining and punishing anyone convicted of rioting. South Dakota law specifies four riot felonies.

SDCL § 22-10-1 defines riot as:
> Any use of force or violence or any threat to use force or violence, if accompanied by immediate power of execution, by three or more persons, acting together and without authority of law, is riot. Riot is a Class 4 felony.

SDCL § 22-10-5 states:
> Any person who carries a dangerous weapon while participating in a riot is guilty of aggravated riot. Aggravated riot is a Class 3 felony.

SDCL § 22-10-6 states:
> Any person who participates in any riot and who directs, advises, encourages, or solicits other persons participating in the riot to acts of force or violence is guilty of a Class 2 felony.

---

[1] *See* S.D. Const. art. 4, § 3; SDCL § 1-11-1(2).

4

SDCL § 22-10-6.1 states:

> Any person who does not personally participate in any riot but who directs, advises, encourages, or solicits other persons participating in the riot to acts of force or violence is guilty of a Class 5 felony.

## Standard of Review

Defendants urge an intermediate scrutiny standard of review, relying upon *United States v. Daley*, 378 F.Supp.3d 539, 553 (W.D. Va. 2019), appeal docketed, *United States v. Gillen*, No. 19-4553 (4th Cir. Jul. 30, 2019). Plaintiffs claim the standard of review should be strict scrutiny. This Court is guided in part by *Phelps-Roper v. Ricketts*, 867 F.3d 883 (8th Cir. 2017) (*en banc*) which applied an intermediate standard of review to Nebraska's Funeral Picketing Law. That law provided for criminal misdemeanor punishment. *Phelps-Roper* involved a determination of whether the Picketing Law dealt with true threats, which are not constitutionally protected.

> In determining the standard of review the *Phelps-Roper* court stated:

> The constitutionality of a statute regulating the exercise of protected speech in a public forum depends in large part on whether it is content based or content neutral. A statute is content neutral so long as it is justified without reference to the content of regulated speech. Content based regulations, such as those which impose special prohibitions on those speakers who express views on disfavored subjects, are presumptively invalid, are subject to the most exacting scrutiny, and must be narrowly tailored to serve a compelling government interest. In contrast, content neutral time, place, or manner regulations must be narrowly tailored to serve a significant governmental interest and allow for ample alternative channels for communication.

*Phelps-Roper*, 867 F.3d at 892.

Both the criminal statutes at issue are on their face content-neutral. Those statutes do not impose special prohibitions on speakers or actors on disfavored subjects, such as peacefully resisting a pipeline.

The inquiry does not in some instances stop with the determination that the statutes are content-neutral on their face. The Supreme Court recognized in *Reed v. Town of Gilbert, Ariz.*, –

5

U.S. – , 135 S. Ct. 2218, 2227 (2015):

> Our precedents have also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be "'justified without reference to the content of the regulated speech,'" or that were adopted by the government "because of disagreement with the message [the speech] conveys," *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Those laws, like those that are content based on their face, must also satisfy strict scrutiny.

The felony statutes were enacted years ago and without the same intent as the 2019 riot boosting statutes and are subject to intermediate rather than strict scrutiny. The felony laws do burden speech and other expressive conduct. A statute survives intermediate scrutiny:

> if it furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*United States v. Dinwiddie*, 76 F.3d 913, 923-24 (8th Cir. 1996) (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)).

The state has a substantial government interest in criminalizing participation in a riot with acts of force or violence. However, SDCL § 22-10-6 and SDCL § 22-10-6.1 go far beyond that appropriate interest and, as will subsequently be discussed with the same language in the riot boosting statutes, do impinge upon protected speech and other expressive activity as well as the right of association.

The next inquiry is "if the governmental interest is unrelated to the suppression of free expression." *Dinwiddie,* 76 F.3d at 923. The governmental interest in criminalizing acts of force or violence in a riot is not related to the suppression of free expression. However, the challenged criminal statutes taken in their entirety meet but, as later discussed, most portions exceed that goal and do then relate to the suppression of free expression.

Finally is "the incidental restriction on alleged First Amendment freedoms . . . no greater than is essential to the furtherance of that interest[?]"  *Dinwiddie*, 76 F.3d at 923-24.  Taking the challenged felony statutes each as a whole, SDCL § 22-10-6 and SDCL § 22-10-6.1 go beyond what is essential to be able to punish by felony conviction those who in a riot commit acts of force or violence.

As a result of this inquiry, the two criminal statutes taken each as a whole do not pass intermediate scrutiny.  Even if these statutes passed intermediate scrutiny, they fail to meet the *Brandenburg v. Ohio,* 395 U.S. 444 (1969), requirements.

The felony statutes, SDCL § 22-10-6 and SDCL § 22-10-6.1, taken as a whole regulate and criminalize much beyond the use of force or violence and do in part restrict free speech.  As a result, neither of the two felony statutes are narrowly tailored to further the government's interests.  The possibility of severability to save a portion of both of those statutes will be discussed later.

By comparison, the riot boosting statutes are aimed at pipeline protests.  SDCL § 20-9-57 provides in part: "There is established in the state treasury the riot boosting recovery fund.  Money in the fund may be used to pay any claim for damages arising out of or in connection with a riot or may be transferred to the pipeline engagement activity coordination expenses fund....  All civil recoveries shall be deposited in the fund."

The reason for the introduction of the riot boosting legislation was also clearly stated by the Defendant Governor:

> This package creates a legal avenue, if necessary, to go after out-of-state money funding riots that go beyond expressing a viewpoint but instead aim to slow down the pipeline build.  It allows us to follow the money for riots and cut it off at the source.

Noem Introduces Pipeline Legislative Package, South Dakota State News, https://news.sd.gov/newsitem.aspx?id=24203 (last visited Sept. 17, 2019).

7

The lobbyist for the Governor's Office before the Joint Committee on Appropriations testified that what was driving Senate Bills 189 and 190 was the experience of North Dakota with outside professional protesters. *See* "Hearing on SB 189 and 190" found at https://sdlegislature.gov/Legislative Session/Bills/Bill.aspx?Bill=SB189&Session=2019. The 2019 riot boosting statutes are subject to strict scrutiny.

## *BRANDENBURG*, OVERBREADTH AND VAGUENESS

The next consideration is the claims that the criminal statutes and the civil riot boosting statutes are vague and overbroad. A statute can be vague or overbroad or both, or neither. ERWIN CHEMERINSKY, CONSTITUTIONAL LAW 948-49 (3d ed. 2006). "A statute is unconstitutionally overbroad if it reaches a substantial number of impermissible applications." *Dinwiddie*, 76 F.3d at 924, (quoting *New York v. Ferber*, 458 U.S. 747, 771 (1982)).

South Dakota Codified Law § 22-10-6 has been in existence at least since the recodification in 1939, so it predates the overbreadth doctrine.[2] There is no grandfather exemption to the overbreadth doctrine and the statute would have been enacted without consideration of the overbreadth doctrine. The overbreadth doctrine's origin is traced to *Thornhill v. Alabama*, 310 U.S. 88 (1940). In 1976, SDCL § 22-10-6.1 used the language of SDCL § 22-10-6 and simply dropped the qualifier of "participates in any riot."

The verbs directs, advises, encourages, or solicits are common to all of the statutes.

To "direct" here is used as a verb even though it can be an adjective or an adverb. The Oxford English Dictionary, now online in Lexico, Oxford English Online Dictionary. 2019. https://www.lexico.com/en (16 Sep. 2019) has the following primary definitions:

direct: "Control the operations of; manage or govern."

advise: "Offer suggestions about the best course of action to someone."

---

[2] The riot statutes have been part of South Dakota's penal code since 1877. *See Bad Heart Bull*, 257 N.W.2d 715, at 720-21 (S.D. 1977).

encourage: "Give support, confidence, or hope to (someone)."

solicit: "[with object] Ask for or try to obtain (something) from someone."

To "direct" involves control while each of the other terms do not involve control. To solicit is to ask for something and to advise, encourage and solicit are all passive in that they do not involve control. None of those three terms involve the direction or control of an activity that results in the use of force or violence. Even though each of those three terms do not involve control, they encompass much, to give hope, or suggestions or to ask for something from someone. Each of those three terms involve expressive activity of many kinds, expressive activity that is protected speech.

Even if the encouragement to protesters is in forceful language as was demonstrated by Charles Evers' speech summarized in part in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 900 n.28 (1982) (Evers told the assembled black people that any "uncle toms" who broke the boycott would "have their necks broken" by their own people. This was directed at all 8,000 black residents of Claiborne County.), that is protected speech. None of these three terms encompass fighting words – or true threats – words that provoke immediate violence and are not protected by the First Amendment. *See id.* at 927 (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)). So, "mere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment." *Claiborne Hardware,* 458 U.S. at 927; *Hess v. Indiana*, 414 U.S. 105, 108-09 (1973). The many words or expressive activities that arise within these three terms, to advise, encourage or solicit, might in some instances be offensive to some or to many people, but they are protected by the First Amendment and cannot be the subject of felony prosecution or of tort liability and damages. Felony or tort liability for one who advises, encourages or solicits is overbroad. Felony or tort liability for one who directs other persons participating in the riot to acts of force or violence is not overbroad.

"To survive a vagueness challenge, a statute must 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited' and 'provide explicit standards for those who apply [the statute].' " *Dinwiddie*, 76 F.3d at 924 (citing *Video Software Dealers Ass'n v. Webster*,

9

968 F.2d 684, 689 (8th Cir. 1992)) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).

The giving of direction to persons participating in a riot to do acts of force or violence is a common thread throughout both the felony statutes and then borrowed into the riot boosting statutes. "To direct" is not vague. The "to direct" provision is not essentially and inseparably connected in substance to the other provisions of advising, encouraging or soliciting. Those three later provisions each stand alone as does direction, they are not modifiers of each other. The prohibition against directing other persons participating in a riot to use force or violence can stand on its own without advising, encouraging or soliciting. As a result, severability must be considered.

> Under South Dakota law, a court must uphold the remaining sections of a statute if they can stand by themselves and if it appears that the legislature would have intended the remainder to take effect without the invalidated section. This rule applies whether or not the statute contains a severability clause. The form of the statute is not determinative; the issue turns on whether its provisions are essentially and inseparably connected in substance. DM&E bears the burden of showing that the legislature would not have enacted the statute without the invalid portions.

*Dakota, Minnesota & Eastern Railroad Corp. v. South Dakota*, 362 F.3d 512, 518-19 (8th Cir. 2004) (citations and quotations omitted).

The riot boosting bill contained no severability clause. That is not fatal as the Defendants have met their burden of showing that the legislature would have enacted the statute without the invalid portions.

The legislature was strongly motivated to pass the riot boosting legislation. The bill was introduced in the last week of the session, long after the deadline for introducing legislation. The bill advanced to votes with only one hearing and the bill contained an emergency clause to make it immediately effective. There is no doubt that the legislature would have passed the riot boosting legislation with only the divisible admonition against directing even without the offending admonitions against advising, encouraging or soliciting.

Given the divisibility of the criminal and civil laws in question, the court finds that each admonition against directing another person participating in a riot to perform acts of force or violence is not vague nor is it overbroad.

By comparison to direction, the court finds the separate admonitions, whether criminal or civil, against advising, encouraging or soliciting to be vague in part because of their very breadth.

Sending a supporting email or a letter to the editor in support of a protest is encouraging. Giving a cup of coffee or thumbs up or $10 to protestors is encouraging the protestors. Holding up a sign in protest on a street corner is encouraging. Asking someone to protest is soliciting. Asking someone for $10 to support protesting is soliciting. Suggesting that the protest sign be bigger is advising. The possible violations of those felony or damage creating statutes against advising, encouraging or soliciting goes on and on. Encouragement, advice or solicitation for the protest on social media would be a fertile ground for damages or charges or both. And each of the examples involve protected speech or expressive activity.

Plaintiffs claim the riot statutes and the riot boosting statutes are unconstitutional under the Constitution of the United States. The *Bad Heart Bull* decision considered the South Dakota constitution but not the constitutionality of riot statutes under the United States Constitution. *Brandenburg v. Ohio* was not discussed. The parties agree that *Brandenburg* is applicable to this litigation. *Brandenburg* has three criteria a state riot statute must contain for federal constitutional review as summarized by the Sixth Circuit Court of Appeals in an *en banc* decision in 2015:

> The *Brandenburg* test precludes speech from being sanctioned as incitement to riot unless (1) the speech explicitly or implicitly encouraged the use of violence or lawless action, (2) the speaker intends that his speech will result in the use of violence or lawless action, and (3) the imminent use of violence or lawless action is the likely result of his speech.

*Bible Believers v. Wayne County, Mich.*, 805 F.3d 228, 246 (6th Cir. 2015) (citing *Brandenburg*, 395 U.S. at 477).

The scope of protected speech from *Brandenburg* was discussed and applied in *N.A.A.C.P. v. Claiborne Hardware Co.* In that case white merchants who had been damaged as a result of civil rights boycotts sued both the participants in the boycott and civil rights organizations that supported the boycotts. The state court granted an injunction and awarded damages. The Supreme Court held that boycott activity which was not itself violent was constitutionally protected and that persons who participated in the boycott who were not shown to have participated in the violent activity or to have ratified it could not be held liable. The Court further held that in the absence of showing that violent activity followed the speeches, the organizer who made impassioned speeches which contained references to violence against those who did not participate could not be held liable, and persons who could be held liable were responsible only for the damages resulting from the violent activity, not for all damages resulting from the boycott. There was no basis for imposing liability on the civil rights organization that supported the boycott of the businesses.

The first of the three bases for tort liability under the South Dakota riot boosting act, SDCL § 20-9-54(1), provides for liability if the person:

(1) Participates in any riot and directs, advises, encourages, or solicits any other person participating in the riot to acts of force or violence;

This provision based upon SDCL § 22-10-6, a class 2 felony, speaks as a first requirement that the person "Participates in any riot. . . ." That provision is too broad by having participated in any riot as a predicate for liability. The provision of "any riot" is not vague but it does suffer from overbreadth. The provisions of "advises, encourages, or solicits" are vague and overbroad as previously discussed.

The Defendants at the argument stated that this provision only applied to participation in the same one riot. That would be correct if the word "any" was stricken and replaced by "the." That, however is not the fact, and the "participating in any riot" language is of no assistance in meeting the requirements of *Brandenburg*.

In addition, "advises," "encourages," or "solicits" do not meet the *Brandenburg* imminency

12

requirement. In *United States v. Sineneng-Smith*, 910 F.3d 461, 480 (9th Cir. 2018), the Court did not find words like "encourage" or "induce" to meet the imminence requirement. The finding was that a statute which made it a crime to "encourage" or "induce" an alien to reside in the country did not require that an alien imminently violate immigration law.

There is however another consideration, that is that "directing . . . any other person participating in the riot to acts of force or violence" is different than advising, encouraging or soliciting. Directing a participant, even if from afar, does meet the *Brandenburg* imminency requirement. The predicate for liability of having participated in any riot is, however, not necessary for liability in the case of one who directs a participant in a riot to acts of force or violence.

The second of the three bases for liability under the riot boosting act, SDCL § 20-9-53(2) provides if the person:

> (2) Does not personally participate in any riot but directs, advises, encourages, or solicits other persons participating in the riot to acts of force or violence;

The predicate of having participated in any riot is gone from SDCL § 20-9-53(2), but the remaining comments as to SDCL § 20-9-54(1) apply. As a result, the only portion of SDCL § 20-9-53(2) that meets the *Brandenburg* imminency requirement is liability to a person who "directs . . . other persons participating in the riot to acts of force or violence." Here we must look at the facts of *Brandenburg* as well as its holding. *Brandenburg* precluded the punishing of advocacy of illegal action as compared to the incitement to imminent lawless action, with only the former being protected speech. In other words, sections (1) and (2) of SDCL § 20-9-54 do not meet the imminency requirement of *Brandenburg*. Without the imminency requirement, Section (2) is unconstitutional under the United States Constitution. Mere advocacy, even if distasteful, is protected speech as distinguished from incitement to immediate lawless action. In *Brandenburg* a large wooden cross was burned at a Ku Klux Klan gathering where some had weapons but the speaker did not. The speaker said, in part:

> We're not a revengent organization, but if our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible that there might

13

have to be some revengeance taken.

We are marching on Congress July the Fourth, four hundred thousand strong. From there we are divided into two groups, one group to march on St. Augustine, Florida, the other group to march into Mississippi.

*Brandenburg*, 395 U.S. at 446. The speech was held to be protected and Ohio's Criminal Syndicalism Act was held to be unconstitutional under the United States Constitution. The Ohio Supreme Court held the Ohio Act to be constitutional. *Id.* at 444.

The third of the three bases for liability under the riot boosting act, SDCL § 20-9-54(3) provides liability if the person:

(3) Upon the direction, advice, encouragement, or solicitation of any other person, uses force or violence, or makes any threat to use force or violence, if accompanied by immediate power of execution, by three or more persons, acting together and without authority of law.

The first portion of (3) provides separately for liability if the person "Upon the direction, advice, encouragement, or solicitation of any other person, uses force or violence." The court must consider this portion of (3) separately regarding its constitutionality as it is divisible from the rest of (3). *Dakota, Minnesota & Eastern Railroad Corp. v. South Dakota*, 362 F.3d at 518; *City of Sioux Falls v. Sioux Falls Firefighters, Local 814*, 234 N.W. 2d 35, 38 (S.D. 1975). That separate first portion of (3) is not protected speech and could properly subject the person using force or violence to tort liability under this riot boosting statute for the damages he proximately caused. The same liability could attach under existing tort law, even though the measure of potential damages is significantly enhanced under the riot boosting statute, SDCL § 20-9-56. This first portion of SDCL § 20-9-54(3) is not unconstitutional under the Constitution of the United States.

The second portion of (3) provides for liability if a person "makes any threat to use force or violence, if accompanied by immediate power of execution, by three or more persons, acting together and without authority of law." This separate provision in SDCL § 20-9-54(3) invites a different analysis, one not suggested by any of the parties. This analysis can be further discussed by the

14

parties in the proceedings requesting a permanent injunction. The analysis is a "true threats" analysis. "True threats" do not have constitutional protection. The Eighth Circuit has a multi-factor test as to whether speech constitutes a true threat. The non-exhaustive factors set forth by Judge Richard Arnold in *United States v. Dinwiddie*, 76 F.3d 925, are:

(1)  The reaction of the recipient of the threat and of other listeners.
(2)  Whether the threat was conditional.
(3)  Whether the threat was communicated directly to its victim.
(4)  Whether the maker of the threat had made similar statements to the victim in the past.
(5)  Whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence.

A further reflection will illustrate the complexities of free speech law. The second portion of SDCL § 20-9-54(3) establishes a cause of action for a person who "makes any threat to use force or violence, if accompanied by immediate power of execution, by three or more persons acting together and without authority of law." A "true threat" is not protected speech under the Constitution. A threat that meets the requirements of the second portion of SDCL § 20-9-54(3) might or might not be protected speech. Whether or not the prohibited threat in SDCL § 20-9-54(3) is not a true threat and thus entitled to constitutional protection will require the application of the *Dinwiddie* factors. How can SDCL § 20-9-54(3) with the *Dinwiddie* factors added possibly meet the test of vagueness? Adding the *Dinwiddie* factors to the second portion of SDCL § 20-9-54(c) to preserve its constitutionality is a stretch too far. A statute must 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited' and 'provide explicit standards for those who apply [the statute].' " *Dinwiddie*, 76 F.3d at 924. Very few lawyers know of the *Dinwiddie* test, let alone the remainder of the population. The second portion of SDCL § 20-9-54(3) with the *Dinwiddie* test added is void because it is vague. Few would know what is prohibited. The *Dinwiddie* test is used after an incident to determine if something that was said was a true threat or speech that has constitutional protection. The *Dinwiddie* factors were applied under existing tort law in *Doe v. Pulaski County Special School District*, 306 F.3d 616 (8th Cir. 2002) (*en banc*) (eighth grade student allegedly threatened a schoolmate and was expelled for what was determined on appeal to be a true threat). The second portion of SDCL § 20-9-54(3) without the *Dinwiddie* factors added

is unconstitutional as being too broad because it would encompass many threats that are protected speech.

At the hearing in the present case the Court suggested one scenario: a rancher and a couple of his ranch hands see that a Keystone Pipeline truck is on some of the rancher's rangeland without permission. The three of them confront the truck driver and they know they are going to give him some clear instruction to get off the ranch, but not fighting words to get off the ranch, and they are not going to do anything physical even though they could. Nonetheless, this scenario could subject the rancher who did the talking to liability under this second portion of SDCL § 20-9-54(3). The cowhands could also be jointly and severably liable under the second portion of that statute. More facts would have to be known to apply the *Dinwiddie* multi-factor test to determine whether their specific instructions to the truck driver were true threats or constitutionally protected speech. Even if additional facts showed their statements to not be true threats but instead constitutionally protected speech, these actors would still be liable under the latter section of SDCL § 20-9-54(3) as it is written without *Dinwiddie* being applied. That portion of the statute cannot attach liability to constitutionally protected speech and in that as-applied example, that portion of SDCL § 20-9-54(3) is unconstitutional. And how would the rancher and his ranch hands reasonably anticipate their liability? "To survive a vagueness challenge, a statute must give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and provide explicit standards for those who apply the statute." *Dinwiddie*, 76 F.3d at 924. The language in the second portion of SDCL § 20-9-54(3) does not meet the vagueness test and is too broad in that it attaches liability in all non-threatening instances to protected speech.

Another scenario comes to mind. Imagine that if these riot boosting statutes were applied to the protests that took place in Birmingham, Alabama, what might be the result? Dr. Martin Luther King, Jr. was the President of the Southern Christian Leadership Conference with headquarters in Atlanta, Georgia. Dr. King personally took part in peaceful demonstrations in Birmingham, Alabama, against segregation. While jailed, Dr. King wrote his public "Letter from Birmingham Jail." Dr. King wrote regarding the Birmingham demonstrations, "You express a great deal of

anxiety over our willingness to break laws." And Dr. King goes on to explain in agreeing with Aristotle that "an unjust law is no law at all," and then on to say "to deny citizens the First Amendment privilege of peaceful assembly and peaceful protest, then it [permitting] becomes unjust." Dr. King and the Southern Christian Leadership Conference could have been liable under an identical riot boosting law for the many types of damages which could be claimed under SDCL §§ 20-9-54 and 20-9-56 for soliciting, advising or encouraging another person to break the law. SDCL § 20-9-56 also creates a separate civil cause of action for soliciting or compensating any other person to commit an unlawful act or to be arrested. Dr. King and the Southern Christian Leadership Conference could be liable for treble damages under that separate cause of action. The separate cause of action in SDCL § 20-9-56 is not vague but it is unconstitutional in that it does not meet the *Brandenburg* requirements and infringes on protected speech and association.

Solicitation in SDCL § 20-9-56 refers to a narrower category of speech than the solicitation used in SDCL § 20-9-54. This prohibition is still overbroad as the illustration with Dr. King demonstrates. The government can prohibit the solicitation of unlawful acts, but the Supreme Court also held that the First and Fourteenth Amendments protected the NAACP's solicitation of clients for challenge litigation. *NAACP v. Button*, 371 U.S. 415, 429 (1963). Soliciting another to be arrested is also too broad. To be arrested is not a crime. An arrest is only an accusation and not even evidence of guilt. *Davis v. United States*, 229 F.2d 181, 185 (8th Cir. 1956).

Compensating another to be arrested is also overbroad even though not vague. In *NAACP v. Claiborne Hardware Co.*, the Court rejected an organization's liability for providing legal counsel and bond to protesters during a boycott. 458 U.S. at 931 n.78. SDCL § 20-9-56 provides too broadly for liability for treble damages for expressive activity that is protected activity according to *Claiborne*. As was argued, our First Amendment "freedoms are delicate and vulnerable, as well as extremely precious." *Button*, 371 U.S. at 433. Because they "need breathing space to survive, government may regulate in the area only with narrow specificity." *Id.* The overbreadth of SDCL § 20-9-56 causes this separate cause of action within SDCL § 20-9-56 to be invalid. The remainder of SDCL § 20-9-56 is a matter of state policy. The measures of damages are generous but those

17

determinations are for the state to decide.

Finally, one of the three *Brandenburg* requirements is that of intent. Neither SDCL § 22-10-6 nor 22-10-6.1 nor the causes of action in SDCL § 20-9-54(1), (2), and the second part of (3), nor the cause of action in SDCL § 20-9-56 have an intent element. The first portion of SDCL § 20-9-54(3) need not have an intent element because that person is personally using force or violence in a riot, and that is not protected speech or assembly.

In *State v. Bad Heart Bull*, the South Dakota Supreme Court inferred criminal intent to Ms. Bad Heart Bull. 257 N.W.2d at 719. She was convicted of the aggravated crime of riot where arson is committed. In discussing the constitutionality of riot statutes, the South Dakota Supreme Court quoted SDCL § 22-10-3 which provides:

> Participant in riot as guilty of felony committed in course of riot. If any murder, maiming, robbery, rape, or arson was committed in the course of a riot, every person guilty of participating in such riot is punishable in the same manner as a principal in such crime.

The Supreme Court went on to state:

> When arson, or any other felony recognized by our statute, is committed in the course of a riot, each rioter may be found guilty of the aggravated crime as a principal. Consequently, in the present case the state was not obligated to show that every rioter committed, or intended to commit, arson.

257 N.W.2d at 719.

SDCL § 22-10-3 was repealed in 1976.

*Bad Heart Bull* was followed in *State v. Kane*, 266 N.W.2d 552 (S.D. 1978), but that was with regard to 1974 events and to *Bad Heart Bull* overbreadth determinations on SDCL § 22-10-1 and SDCL § 22-10-5 as applied to SDCL § 22-10-4 (repealed in 1976).

Other related statutes have intent elements, such as intentional damage to property, which can be either a misdemeanor or a felony, SDCL § 22-10-1, as do the arson felonies, SDCL

§ 22-33-9.1, SDCL § 22-33-9.2, and SDCL § 22-33-9.3.

The Court also notes that there is no South Dakota Pattern Jury Instruction for the various riot felonies. However, the South Dakota Pattern Jury Instruction for "Disorderly Conduct – Elements" 3-23-31, has an intent element which requires that "[t]he defendant intentionally caused..." as does the misdemeanor disorderly conduct statute: "[a]ny person who intentionally causes serious public inconvenience." SDCL § 22-18-35.

This Court concludes that the South Dakota Supreme Court would not read an intent element into any of the statutes in question.

Another of the three requirements of *Brandenburg* is an immediacy requirement. There is no immediacy requirement in any of those statutes with one exception in common with all of the statutes. The exception is where the statutes attach criminal or civil liability to a person who "directs . . . any other person participating in the riot to acts of force or violence;" in each such instance, the requirement of immediacy is met.

With the exceptions noted, all of the statutes discussed fail to meet the *Brandenburg* test and are unconstitutional under the First Amendment of the United States Constitution.

## MOTION FOR CERTIFICATION

Defendants urge that the Court certify a question to the South Dakota Supreme Court pursuant to SDCL Chapter 15-24A. The request to certify is denied for two reasons.

First, neither the question urged nor any other question would meet the requirement of SDCL § 15-24A-1 that the answer to the question certified would "be determinative of the cause pending before the certifying court."

Next, as the Eighth Circuit Court of Appeals said in *Planned Parenthood, Sioux Falls Clinic*

*v. Miller*, 63 F.3d 1452, 1465 (8th Cir. 1995):

> We conclude that the South Dakota Supreme Court would not read a scienter element into the plain language of this statute. Since this statute is unambiguous and not easily susceptible to a limiting construction, we find no reason to certify this issue.

The same is true in the present case. The statutes are clear, there is no scienter element, and a limiting construction would not be of assistance.

## INJUNCTION CONSIDERATIONS

In determining whether to grant a preliminary injunction a court considers (1) the probability of the movant's success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of the preliminary injunction is in the public interest. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (*en banc*). The Eighth Circuit has placed a heightened standard for enjoining state statutes. *See Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731-32 (8th Cir. 2008) (*en banc*) (reaffirming "that a party seeking a preliminary injunction of the implementation of a state statute must demonstrate more than just a 'fair chance' that it will succeed on the merits. We characterize this more rigorous standard, drawn from the traditional test's requirement for showing a likelihood of success on the merits, as requiring a showing that the movant 'is likely to prevail on the merits.'"). The Plaintiff bears the burden of proof concerning the four factors. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987). The court balances the four factors to determine whether a preliminary injunction is warranted. *Dataphase*, 640 F.2d at 113; *West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986). "A district court has broad discretion when ruling on preliminary injunction requests[.]" *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 782 (8th Cir. 2004) (citing *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998)).

## Likelihood of Success on the Merits

As is shown above, the Plaintiffs are likely to prevail on most of their challenges to the riot boosting act with the possible exception for direction of another person participating in a riot to use

force or violence. Plaintiffs are likely to prevail on their other challenges to two of the felony riot statutes, SDCL § 20-10-6 and SDCL § 20-10-6.1, and the riot boosting laws, SDCL § 20-9-53 through SDCL § 20-9-57.

## Irreparable Harm

The threat of irreparable harm to the movants is clear and substantial. For the protests, planning and seeking public support, must take place now, before and in anticipation of the next construction season. Also, fund-raising must be done now to further planning and preparation for the protests. If those things are not done now, resources are not available in advance of the next construction season. Once the construction starts, the protests must at the latest be ready. The protesters desire to be active in advance of the construction season as opposed to waiting for construction to happen. If public opinion is to be swayed, it should be done before further construction takes place. Those in favor of the pipeline should also have opportunity to respond rather than having all confrontation taking place during actual construction.

## Balance of Harms

The state of balance between the harm and the injury that granting the injunction will inflict on the other parties litigant weighs in favor of the Plaintiffs. Only state officials, the Governor and the Attorney General are the remaining Defendants, with the Sheriff of Pennington County having been dismissed from this lawsuit. If the riot boosting act enforcement is enjoined with the exceptions noted, the Legislature meets next January and it could pass legislation to meet federal constitutional requirements if it wishes to supplement what remains of the riot boosting statutes. The Plaintiffs and others are currently precluded by the chilling effect of the riot boosting legislation from protesting and supporting peaceful protest against the Keystone Pipeline being built through South Dakota. If enforcement of the current riot boosting statute is enjoined, there has been no showing of any activity that would have been the subject of claims under the riot boosting statute. Further, the riot boosting law was passed with an emergency clause so it has been in effect since March of 2019. The Court is unaware of any claims being made under the riot boosting statutes. The statement of the Defendant Governor at the introduction of the legislation was in part:

21

> This package creates a legal avenue, if necessary, to go after out-of-state money
> funding riots that go beyond expressing a viewpoint but instead aim to slowdown the
> pipeline build. It allows us to follow the money for riots and cut it off at the source.[3]

Allegedly, significant costs were incurred by North Dakota counties where the Keystone Pipeline protests occurred. Whether that will also be the case in South Dakota remains to be seen. The harm to the Defendants for granting the injunction is slight. The injury to movants in not granting the preliminary injunction is substantial.

## Public Interest

In whose favor do the public policy considerations weigh? Is one goal to keep outsiders out? If so, that is not a laudable goal as we are a nation of 50 states with each citizen in any state having the same rights of free speech and assembly in every state. However, no one has the right to start or participate in a riot. Another goal was to assist the nine counties through which the pipeline will pass in South Dakota. The only affected county with a significant population is Pennington County with about five miles of pipeline through it. Some of the other counties have a lot more pipeline going through with a small county tax base. For example, Jones County has an estimated population of between 740 and 928 with a per capita income of $15,896. However, it is not known what expenses will be incurred by each county that are proximately caused by protestors. Concern for the possible effect on taxpayers of those counties is a true concern if it comes to pass. That concern is speculative while the impact upon the Plaintiffs is not speculative as they are being precluded from presently desired free speech activity. The damage provisions are very broad and also encompass other persons and entities other than counties. For example, given the wording of the riot boosting statutes, Keystone Pipeline could recover its attorney fees as well as other internal expenses from pursuing a riot boosting action, with the damages being trebled and with punitive damages also allowed. These extraordinarily broad tort damages which could also include Keystone personnel time, do not meet the public policy concerns that are applicable to the taxpayers of the involved counties. By comparison, the freedom of speech and association are constitutional rights that are

---

[3] *Noem Introduces Pipeline Legislative Package*, South Dakota State News,
https://news.sd.gov/newsitem.aspx?id=24203 (last visited Sept. 17, 2019).

central to all citizens of our country. Those rights will be thwarted if the unconstitutional portions of the riot boosting legislation remain in effect. The public policy concerns weigh in favor of the Plaintiffs.

After weighing all four *Dataphase* factors the Court finds that a preliminary injunction is warranted.

On the basis of the above discussion,

IT IS HEREBY ORDERED:

I.      That the Motion for Preliminary Injunction, Doc. 8, is granted as follows:

1.      The application and enforcement of SDCL § 20-9-54 is temporarily enjoined except for the portion of the statute which provides:

> In addition to any other liability or criminal penalty under law, a person is liable for riot boosting, jointly and severally with any other person, to the state or a political subdivision in an action for damages if the person:
> (3) Upon the direction, advice, encouragement, or solicitation of any other person, uses force or violence.

2.      SDCL § 20-9-56 remains in effect except for the sentence which provides: "A defendant who solicits or compensates any other person to commit an unlawful act or to be arrested is subject to three times a sum that would compensate for the detriment caused." The just quoted sentence is temporarily enjoined.

3.      SDCL § 20-9-55 remains in effect.

4.      SDCL § 20-9-57 remains in effect.

5.      The application and enforcement of SDCL § 22-10-6 is temporarily enjoined.

6.      The application and enforcement of SDCL § 22-10-6.1 is temporarily enjoined.

23

II.     That the Motion for Judgment on the Pleadings or, in the Alternative, for Certification to the South Dakota Supreme Court, Doc. 27, of Defendants Kristi Noem and Jason Ravnsborg is denied.

Dated this 18th day of September, 2019.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN CLERK

24